**Brian A. CHURCH, Petitioner–Appellant,**

**v.**

**George E. SULLIVAN, Respondent–Appellee.**

**No. 89–2266.**

United States Court of Appeals,
Tenth Circuit.

Aug. 26, 1991.

Tova Indritz, Federal Public Defender, Albuquerque, N.M., for petitioner-appellant.

Margaret McLean, Asst. Atty. Gen., Santa Fe, N.M. (Hal Stratton, Atty. Gen., with her on the brief), for respondent-appellee.

Before HOLLOWAY, Chief Judge, ALDISERT * and EBEL, Circuit Judges.

* Honorable Ruggero J. Aldisert, United States Circuit Judge of the Third Circuit, sitting by designation.

HOLLOWAY, Chief Judge.

Petitioner Church appeals an order of the district court, denying with prejudice his petition for a writ of habeas corpus sought pursuant to 28 U.S.C. § 2254. Church seeks habeas relief following his conviction on a jury verdict in Hidalgo County, New Mexico, as an accessory to an armed robbery in violation of N.M.Stat.Ann. §§ 30–16–2, 30–1–13 (1978).[1] We reverse the district court's determination that a procedural bar precluded habeas review of some of Church's claims; we remand for an evidentiary hearing on Church's Sixth Amendment ineffectiveness of counsel claim and his due process claim of jury misconduct; we affirm the remaining decisions on Church's claims.

## I.

### Factual and Procedural Background

On the evening of June 13, 1985, three individuals were involved in the robbery of an elderly couple, Virginia and Carl Wilson, at the couple's home near Lordsburg, New Mexico. According to the Wilsons, one of the robbers was a man who had arrived at their home two or three days earlier requesting water for his overheated engine. Carl Wilson had accompanied the man to a jeep and then returned home without incident. The man, later identified as codefendant Ray Hernandez, was described by the Wilsons as a Hispanic man with a fumanchu mustache.

On the evening of the robbery, Hernandez returned to the Wilson home with a woman, later identified as Kimala Bailey. Under the pretext of a courtesy visit to introduce "his wife," Hernandez and Bailey entered the Wilson home, whereupon Hernandez pulled a pistol on the Wilsons. After taping the Wilsons' hands and feet, Hernandez demanded to know where they kept their turquoise and gold. Virginia Wilson turned over a box containing unprocessed gold and some old coins. Hernandez then blindfolded the Wilsons. The house was searched for valuables, and in addition to the gold and coins, cash and jewelry were taken. At some time during this search, Virginia Wilson detected through her blindfold the presence and shape of a third robber whom she heard whispering to the other two. She described the third robber as male, short and slender. The robbers left the Wilsons tied up on their beds. While leaving the Wilsons' driveway, the robbers' vehicle knocked over a post and small tree. The Wilsons later freed themselves and summoned the police.

At the crime scene Hidalgo County Sheriff Darnell observed and photographed three sets of footprints in the Wilson driveway. During his investigation over the next few days, Darnell, along with state policeman French, encountered Bailey and her boyfriend, Kelly Green, living at a campsite in the nearby Burro Mountains. Bailey told Darnell that on the day of the robbery a man named Brian driving a yellow jeep with a passenger named Hernandez had stopped at their campsite. At the mention of the jeep, French recalled that on June 1st, two weeks before the robbery, he had observed two men and a yellow jeep parked along a dead end road, less than a mile from the Wilson home. French had run and filed a registration check on the jeep. It was registered to Church and his

---

1. Respectively, these statutes provide:

 **30–16–2. Robbery.**

 Robbery consists of the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence.

 Whoever commits robbery is guilty of a third degree felony.

 Whoever commits robbery while armed with a deadly weapon is, for the first offense, guilty of a second degree felony and, for second and subsequent offenses, is guilty of a first degree felony.

 **30–1–13. Accessory.**

 A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime and although the principal who directly committed such crime has not been prosecuted or convicted, or has been convicted of a different crime or degree of crime, or has been acquitted, or is a child under the Children's Code[.]

fiance, Laura Wilson.[2] Subsequently Darnell also learned that on the evening of June 12th, another police officer had seen a yellow jeep with a black top, registration unknown, standing empty on the same road, within a quarter mile of the Wilson home.

Using the registration address, Darnell phoned the Ruidoso police and asked them to locate Church and Laura. The two agreed to come into the Ruidoso police station, and at Darnell's request, they were fingerprinted and photographed. Over the phone, Church told Darnell that he had been prospecting in the Lordsburg area, but knew nothing about a robbery or a Hispanic man with a fu-manchu mustache. Darnell returned to the campsite and photographed Green and Bailey. He also compared Bailey's footprints to those photographed at the Wilson home and found them to be similar.

After seeing Bailey's photo, the Wilsons identified Bailey as the woman who robbed them. Darnell brought Bailey and Green into the station. Bailey confessed, implicating herself, Hernandez and Church. In her statement, Bailey said that on the morning of the robbery, she and Green had first met Hernandez and Church, who arrived at the campsite looking for an old prospecting claim belonging to Church's grandfather. According to Bailey, the two drove off in the jeep, but returned later for dinner. She said that after dinner, Church and Hernandez recruited her to help rob the Wilsons. Green refused to participate and stayed behind. Bailey said that during the robbery, Church waited in the jeep outside until the Wilsons were blindfolded, but then entered and did most of the searching. After Bailey finished her statement, Green turned over to the police the two jackets which the Wilsons had identified as being worn by the man and woman entering their home. Green also gave the police the Wilsons' gold and coin box. On this information, Church was arrested and his jeep was impounded.

Darnell came to see Church in the Ruidoso jail on July 7, 1985. Church was given *Miranda* warnings and he agreed to talk with Darnell. Although he initially denied involvement in the robbery, later that evening he requested that Darnell return to the jail. Darnell agreed to allow Church to speak with Laura at their home, after which Church made a taped statement confessing his participation as the third robber.

### A. Trial

Church was tried before a jury in the Hidalgo County district court from March 11–13, 1986. The State's theory was that Church's motive for the robbery was revenge. There was evidence that Church had approached Carl Wilson in 1980, seeking information about mining property that Wilson and Church's grandfather had claimed as business partners, years before. Wilson initially refused to disclose the location, but after Church's repeated visits the same year, Wilson took Church to an old mining site. Nevertheless, Church still believed that Wilson had cheated Church's grandfather by staking a claim in the Burro Mountains without his grandfather's knowledge. As a result, Church spent considerable time searching the mountains for Wilson's claim markers.

There was also evidence of the following facts. In 1981, Church was incarcerated in a federal prison. While there, he befriended Ray Hernandez. Upon Church's release from prison in 1983, he resumed his search in the mountains for proof of Wilson's alleged duplicity.

Two days before the instant robbery Church telephoned Hernandez and then picked him up in Albuquerque. The two drove in Church's yellow jeep to the Lordsburg area. The day after the Wilson robbery, Church and Hernandez went to Church's home where they researched the value of some coins that Church claimed to have found in the mountains. Hernandez

**2.** To avoid confusion, Laura Wilson, who is not related to the victims, shall be referred to simply as "Laura."

stayed overnight and Church drove him back to Albuquerque on June 15th.

In addition to Church's confessions, the State offered in evidence a pistol belonging to Church. The State also presented evidence that Church sold unprocessed gold to a Ruidoso jeweler and some old coins to a Roswell, N.M., coin dealer shortly after the robbery. Additionally, the State presented receipts dated shortly after the robbery showing that Church purchased a new tire for his jeep (allegedly to replace one damaged while fleeing the crime scene) and that Church wired Hernandez $82.67 via Western Union.

Church testified on his own behalf, denying any involvement in the robbery itself and asserting that he had been prospecting that night. He said he confessed to the crime only to protect Laura from Darnell's threats to arrest her on unfounded charges and to secure Darnell's promise to return the jeep and Laura's photos and fingerprints to her. According to Church, shortly before the robbery he had given Hernandez a ride from Albuquerque to Tularosa, N.M., where Hernandez' brother lived. After dropping Hernandez off on June 13, Church encountered Bailey and Green outside Lordsburg. Church alleged that Bailey asked him if he knew where she could obtain some "speed." Church gave her Hernandez' phone number, and then went into the mountains until the following day.

Church's defense theory was that Hernandez, Bailey and Green robbed the Wilsons while he was gone, using information obtained from Church that the Wilsons kept gold in their home. Church further posits that Bailey accused him to protect Green, the third robber. Moreover, Church contends that Green smuggled drugs to Bailey to ensure she would not change her story. Church also explained that the gold and coins he sold were his, and that the money sent to Hernandez was to repay an earlier debt.

Both of the Wilsons testified at trial about the details of the robbery. Also, Kelly Green and Kimala Bailey testified as prosecution witnesses. In return for her testimony, Bailey received a lighter sentence for her involvement in the robbery.

## B. *Conviction and Post-Trial Proceedings*

The jury convicted Church of a single count of accessory to an armed robbery. He was sentenced to ten years' imprisonment, followed by two years of parole.[3] Church then appealed to the New Mexico Court of Appeals, alleging error because: (1) an involuntary confession was admitted in evidence against him; (2) the denial of his motion for a change in venue violated his right to an impartial jury; and (3) the evidence was insufficient to support his conviction. The state appeals court rejected each of these claims and Church's petition for certiorari to the New Mexico Supreme Court was denied without opinion. *Church v. State*, 104 N.M. 378, 721 P.2d 1309 (1986) (Table).

Church then filed a *pro se* petition for a writ of habeas corpus in the Hidalgo County district court. In addition to the three grounds for reversal argued on his direct appeal, Church also alleged as constitutional errors that: (4) members of his jury were exposed to improper third party communications during a trial recess; (5) his trial counsel, Mr. Ogden, was ineffective due to a conflict of interests arising from his prior representation of Green, Ogden's failure to prepare, and the trial court's erroneous refusal to allow Church to act as co-counsel; (6) inconsistent testimony was admitted at trial in violation of due process. Accompanying the state habeas petition, Church filed motions for an evidentiary hearing and for the appointment of counsel. The state habeas court denied the motions for appointment of counsel and a hearing and ruled against Church's petition on the merits. A *pro se* petition for a writ of certiorari to the state Supreme Court was denied without opinion.

---

3. · Although not relevant to this appeal, Church's sentence was subsequently enhanced with four additional years of imprisonment following the filing by the State of a habitual offender supplemental information pursuant to N.M.Stat.Ann. § 31–18–17(C).

Having exhausted his state remedies, Church filed the instant habeas petition in the federal district court. The petition alleges all six of the claims raised in his state habeas petition. In addition, Church filed motions for evidentiary hearings on his involuntary confession, jury misconduct and conflict of interests claims, which were denied. The petition was referred to a federal magistrate. He issued proposed findings and recommended that the petition be dismissed with prejudice on various grounds. After a *de novo* review of the portions objected to, the district court adopted the magistrate's findings and recommendations *in toto*, and dismissed the habeas petition with prejudice. A timely notice of appeal was filed and a certificate of probable cause was issued by the district judge.

## II.

### Discussion

Although Church presents a number of issues, we will discuss primarily the procedural default questions, the jury misconduct claim, the ineffective assistance of counsel claim, and the voluntariness of his confessions.

### A. Procedural Default

█ The federal district court did not reach Church's jury misconduct or due process claim concerning inconsistent testimony because it adopted the magistrate's determination that federal habeas review was precluded by procedural default.[4] Under the procedural default doctrine as defined in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), federal habeas review of a federal claim which a state court has refused to consider because of the petitioner's noncompliance with state procedural rules is barred "absent a showing of 'cause' and 'prejudice' attendant to a

state procedural waiver[.]" *Id.* at 87, 97 S.Ct. at 2506.

█ In *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the Supreme Court created an exception to *Sykes'* cause and prejudice test by extending the "plain statement" rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to federal habeas cases. *Harris* held that: "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." 489 U.S. at 263, 109 S.Ct. at 1043 (quotations omitted). The Court also noted, in footnote, that "[t]his rule necessarily applies only when a state court has been presented with the federal claim[.]" *Id.* at n. 9; *see also Teague v. Lane*, 489 U.S. 288, 299, 109 S.Ct. 1060, 1068, 103 L.Ed.2d 334 (1989) (plurality) (noting that the *Harris* rule is "simply inapplicable ... where the claim was never presented to the state courts").

In applying *Harris* here, the magistrate looked not to the New Mexico habeas court decision, but to the earlier state court of appeals decision on direct review. Although the state habeas court had reached the merits of Church's claims without addressing or raising a procedural default question, the federal magistrate discounted that court's opinion because of his view that the state habeas court "did not have jurisdiction to decide those issues" due to waiver by Church of the claims. *See* I R., Doc. 47 at 11 n. 6; *State v. Gillihan*, 86 N.M. 439, 524 P.2d 1335 (1974) (holding that under New Mexico procedural rules, issues suitable for resolution by direct appeal but not there raised are waived for later state habeas petitions). Thus, the magistrate concluded that

---

**4.** In fact, the magistrate found that Church had also defaulted on his three-pronged ineffective assistance claim, discussed in Part II C, *infra.* Nonetheless, because the magistrate concluded that the ineffective assistance challenge fell within New Mexico's fundamental error exception to its waiver rule, the magistrate reached the merits of this claim. *See* I R., Doc. 47 at 3–

6, 8–13. Although there is some confusion created because the magistrate's procedural default analysis overlaps part of the ineffective assistance claim, *see id.* at 13 (listing "ground 4" as barred), we read the opinion to have reached the merits on all three prongs of the ineffective assistance claim.

the last state court in a position to render judgment was the court of appeals when it ruled on the merits of petitioner's direct appeal. At that time, petitioner had not raised the issues in question at all in the state court.... Therefore, according to *Teague*, the *Harris* exception does not apply and procedural default exists.

*Id.* at 11–12. Finding that Church failed to establish "cause" and "prejudice" as required by *Sykes*, the magistrate refused to reach these claims. As noted, this ruling was adopted by the district court.

We are persuaded that the rulings of the district court and the magistrate were in error in holding two claims (the jury misconduct claim and the due process claim concerning inconsistent testimony) were precluded from federal habeas review. The Supreme Court has recently revisited the procedural bar issues in *Ylst v. Nunnemaker*, —— U.S. ——, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). There, the Court faced the question whether a California Supreme Court order denying a second habeas petition without explanation constituted a "decision on the merits" sufficient to lift the procedural bar imposed earlier on a direct appeal. The Ninth Circuit had held that the state ruling did constitute a decision on the merits due to a presumption that when a federal claim is denied without explicit reliance on state grounds, the merits of the federal claim are the basis for the judgment. The Supreme Court disagreed.

The Court focused on the problem of what meaning should be attributed to "formulary orders"—orders stating no reasons for the rulings. The Court held that

Attributing a reason [to a formulary order is] ... both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: where there has been one reasoned state judgment rejecting a federal

claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion 'fairly appear[s] to rest primarily upon federal law,' *Coleman,* —— U.S., at ——, 111 S.Ct., at 2559, we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

111 S.Ct. at 2594.[5]

As instructed by the Supreme Court, we must focus on the last state court decision explaining its resolution of Church's federal claims. *See Ylst,* 111 S.Ct. at 2595. We are convinced that as used in *Ylst, Harris,* and *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 2550, 115 L.Ed.2d 640 (1991), the New Mexico habeas court decision is dispositive. Moreover, that court's ruling on the merits of Church's federal claims meets the *Coleman* condition because it "fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims," so that a procedural bar does not apply here. *Coleman,* 111 S.Ct. at 2557; *Harris,* 489 U.S. at 261, 109 S.Ct. at 1042; *Ulster County v. Allen,* 442 U.S. 140, 147–54, 99 S.Ct. 2213, 2219–23, 60 L.Ed.2d 777 (1979).

We are satisfied that the New Mexico habeas court did not invoke a procedural bar as to any claim before it. As noted, the magistrate held that the New Mexico habeas court had no jurisdiction to reach the merits of various federal claims of Church and hence disregarded its rulings on their merits. We feel this analysis is in error under the Supreme Court's decisions and reject this approach because it is "intrusive for a federal court to second-guess

---

5. The *Sykes* requirements of "cause" and "prejudice" apply where the state courts were never presented with a federal claim, and where a state procedural default rule would therefore bar their review. *See Teague v. Lane,* 489 U.S. 288, 298–99, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989) (plurality); *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982). Here the federal claims were presented to the New Mexico habeas court and thus no such procedural problem faces Church.

a state court's determination of state law." *Harris*, 489 U.S. at 264, 109 S.Ct. at 1044. Accordingly, the magistrate and the district court here erred in failing to address Church's claims on the basis of procedural default under New Mexico law.

### B. The Due Process Claims of Jury Misconduct and Inconsistent Testimony

■ Church first presented his due process claim of improper juror contact to the state court in his *pro se* habeas petition accompanied by motions for an evidentiary hearing and for the appointment of counsel. The state habeas court denied the motions and rejected Church's claim on the merits, stating: "[t]here is no showing that any juror 'broke the Judge's order not to discuss the case', and there is no showing that any juror discussed Church and the trial with the jailer's wife, whoever she might be." I R., Doc. 7, Ex. I at 2, ¶ 4. The state habeas court did not hold a hearing. Church's petition for certiorari to the New Mexico Supreme Court was denied.

In the federal district court, Church again raised this claim. Accompanying his motion for an evidentiary hearing in federal court were the affidavits of Michelle and Robert Miller, acquaintances of the defendant. *See* I R., Attachments to Doc. 40. According to Ms. Miller's affidavit, during an afternoon break at Church's trial she observed a woman that Church had identified to her as his "head jailer's wife" speak with "some of the jurors" for about "ten minutes." *Id.* Ms. Miller stated that "[a]lthough I did not hear most of the conversation, at one point I heard the woman mention Brian Church's name." *Id.* In his affidavit, Mr. Miller also claims to have observed this same woman during the same break "talking to several of the jury members." Mr. Miller's affidavit states, "I overheard her saying, 'How could he (or they) do this to these old people?' and 'How could anybody do this?'" *Id.* Moreover, his affidavit alleges that "the jury and the victims and other spectators to the trial all mingled together during the breaks in the hallway." *Id.*

The federal district court did not consider Church's request for an evidentiary hearing on his improper juror contact claim because it found federal review precluded by procedural default. We have held that ruling was in error. And having considered the arguments of both parties on the merits of this request, we conclude that Church is entitled to the requested evidentiary hearing under *Townsend*.

The Sixth Amendment to the United States Constitution, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... trial by an impartial jury ... [and to] be confronted with the witnesses against him[.]" Indeed, claims of improper juror contact touch "the core of the Sixth Amendment's right to ... an impartial jury[.]" *United States v. Day*, 830 F.2d 1099, 1103 (10th Cir.1987); *see also Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir.1988) ("No right touches more the heart of fairness in a trial."), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989).

The Supreme Court has recognized that "the remedy for allegations of juror partiality is a hearing" on the merits. *See Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). So, too, we have concluded that "[w]hen a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of prejudice, if any, to the defendant." *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir.1988) (citing *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954)), *cert. denied sub nom., Green v. United States*, 489 U.S. 1069, 109 S.Ct. 1349, 103 L.Ed.2d 817 (1989).

To date, there has been no hearing at all on Church's claim of improper juror contact despite the allegations in the Miller affidavits. These affidavits present a sufficient showing by Church to entitle him to an evidentiary hearing under the authorities cited above. Accordingly, we remand the

issue of improper juror contact to the federal district court for an evidentiary hearing.

 We hold, however, that Church's other due process claim, precluded from review below, is without merit. Church argues that the Wilsons' statements at and before trial "were so inconsistent with each other that his rights to due process and a fair trial have been violated." Appellants Brief at 49–50. Church cites no authority for this submission, nor does he identify specific inconsistencies for our review. We agree with the State that any inconsistencies that existed were either clarified at trial or resolved by the jury. *See United States v. Beaulieu*, 900 F.2d 1531, 1535 (10th Cir.) (noting that resolution of conflicting testimony is the "exclusive province of the jury"), *cert. denied*, —— U.S. ——, 110 S.Ct. 3252, 111 L.Ed.2d 762 (1990).

### C. Ineffective Assistance of Counsel

Church launches a three-pronged challenge to the effectiveness of his trial counsel, alleging that counsel worked under an impermissible conflict of interests, that counsel was inadequately prepared to try the case, and that the trial court should have permitted Church to act as co-counsel because his attorney was inadequately prepared. *See* Appellant's Brief at 44–48. We will address these challenges separately.

### 1. *Conflict of Interests*

 At some time prior to Church's trial, Kelly Green was arrested, tried and convicted for smuggling methamphetamine to his girlfriend, Kimala Bailey, while she was in jail awaiting trial for the instant armed robbery. *See* T.13 at 14:30–16:55, 3/12/86. Green's attorney in the methamphetamine proceeding was Carlos Ogden. Ogden was later appointed to represent Church in the New Mexico robbery case following the withdrawal of Church's first attorney, who handled the preliminary hearing.

At Church's trial, both Green and Bailey testified for the State. Church's defense theory was that Green was actually the "third robber" and that Bailey had implicated Church to protect Green. Consistent with this theory, Church sought to show that Green's conviction for smuggling methamphetamine to Bailey resulted from Green's efforts to ensure that Bailey continued to "cover" for him. *See id.* at 38:45–39:30, T.17 at 4:45–5:10, 3/13/86; Appellant's Brief at 45.

In his *pro se* state habeas petition, Church first raised this conflict issue as part of a general attack on the effectiveness of his trial counsel. The state habeas court, implicitly denying Church's claim, stated only: "Church claims his second attorney (Carlos Ogden?) had a conflict of interest when he represented the witness against Church. Church does not name names or tell us what he is talking about. This court is not able to devine [sic] what this is all about." I R., Doc. 7, Ex. J. No evidentiary hearing was ever held in state court on this claim.

In the federal district court, Church specifically argued that he was denied his Sixth Amendment right to the effective assistance of counsel because of the successive representations by Ogden of Church and Green. Church claims that Ogden was unable to adequately cross-examine Green on Green's role as the third robber for fear of violating the attorney-client privilege. *See* Appellant's Brief at 46.

The federal magistrate rejected this claim without an evidentiary hearing. First, the magistrate ruled that Church had "abandoned the issue when he sought a writ of certiorari" following denial of his state habeas petition. I R., Doc. 47 at 4. Moreover, the magistrate found the claim to be without merit because Ogden had "informed the court that he had previously represented Kelly Green in connection with Green's smuggling dope to his girlfriend" and that Ogden "fully cross-examined Kelly Green; particularly, concerning Green's involvement in the drug smuggling incident." *Id.* at 5. In his subsequent objections to the magistrate's proposed findings and recommendations, Church requested an evidentiary hearing on this matter. I R., Doc. 48 at 4, ¶ 4. The district court, in

adopting the magistrate's view, implicitly denied this request. On appeal, Church argues that the district court erred in refusing to hold an evidentiary hearing on his conflict of interests claim as required by *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

■ Under *Townsend,* there are two steps to determining whether an evidentiary hearing is required. First, before a federal court may exercise its power in habeas corpus to conduct an evidentiary hearing, the applicant must "allege[ ] facts which, if proved, would entitle him to relief[.]" *Id.* at 312, 83 S.Ct. at 757. Once a claimant satisfies this initial inquiry, *Townsend* explains, "the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in the state court, either at the time of the trial or in a collateral proceeding." *Id.,* 372 U.S. at 312, 83 S.Ct. at 757.

Without question, Church has had no evidentiary hearing on this issue, either by the state or federal courts. Thus, the only question in this portion of Church's appeal is the threshold one, whether he has alleged the requisite facts that would entitle him to relief.

The Supreme Court has declared that: "[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). In this circuit, we apply the conflict principles from multiple representation cases to successive representation cases involving factually related litigation. *See United States v. Winkle,* 722 F.2d 605, 610 (10th Cir.1983).

■ To establish a Sixth Amendment conflict violation, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interests adversely affected his lawyer's performance." *Cuyl-*

*er v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980) (footnote omitted). Moreover, "if the defendant can show that his attorney's previous representation of the witness adversely affected the adequacy of the defendant's representation, then the defendant need not demonstrate prejudice to obtain relief." *Winkle,* 722 F.2d at 610 (citing *Cuyler*).

We believe that Church has shown the existence of an "actual conflict" within the meaning of *Cuyler.* This showing is sufficient to entitle him to the relief sought—an evidentiary hearing—in which he might develop facts sufficient to prove that the conflict adversely affected his representation. Should he succeed, he would then be entitled to *Cuyler*'s presumption of prejudice.

Initially, we note that the magistrate inaccurately concluded that Church "abandoned" his conflict claim in applying to the New Mexico Supreme Court for collateral relief. In his petition for state habeas relief, Church designated the conflict of interests claim as part of his sixth ground for relief. *See* I R., Doc. 7, Ex. H at 2. Subsequently, Church filed a *pro se* petition in the New Mexico Supreme Court which omits this ground in the "Questions Presented for Review" section. Nevertheless, Church clearly raised this Sixth Amendment claim before that court by alleging in the same petition that: "Petitioner's right to effective assistance of counsel was violated ... [because of] the second attorney's conflict of interest when attorney [sic] represented a witness against the petitioner[.] ... The second attorney (Carlos Ogden) represented Kelly Green (on a drug charge) who was the co-defendant's boyfriend who testified against petitioner [sic]." I R., Doc. 7, Ex. J at 3. Thus, this claim was not "abandoned."

The uncontested facts of this case show an inherent, but actual, conflict of interests.[6] At trial, Church's defense theory sought to show that Green was the third robber, and that Green smuggled drugs to

---

**6.** As background, we also note that Church's relationship with Ogden involved some level of dissension. *See, e.g.,* T.1 at 1:00–1:21, 3/11/86 (Church threatens to strike Ogden in a letter to

the court); *id.* at 3:40–3:48 (Church, though represented, files handwritten motions to the court).

Bailey to ensure she would continue to inculpate Church. Whether one believes this theory or not, there is no dispute that Green was present during the planning of the crime and later division of the loot in his camp. Green also knew where the stolen box and robbers' jackets had been stashed. T. 13 at 11:25–12:40, 18:50–23:20, 3/12/86. More significantly, Green himself testified on direct that Bailey "promised me that if I did that [smuggled drugs to her], she'd go ahead and give her testimony and everything, and help, which she had pretty much been doing at the time." *Id.* at 15:35–15:55, 3/12/86. Thus, the record shows, without contradiction, that Green was somewhat involved with the robbers, and that his efforts to smuggle drugs to Bailey were factually related to promoting her subsequent testimony against Church at trial. Since Ogden represented Green for smuggling drugs to Bailey, the representation necessarily involved the circumstances and motivation for Green's actions—topics clearly covered by the attorney-client privilege. Absent a waiver by Green, Ogden could not fully cross-examine him in these areas about any privileged information he received.

In *United States v. Bowie*, 892 F.2d 1494 (10th Cir.1990), we there explained that "[w]hen defense counsel has previously represented a government witness in a related case, the primary conflict-of-interest concern is that defense counsel may not be able to effectively cross-examine the witness for fear of divulging privileged information." *Id.* at 1501. *Accord Winkle*, 722 F.2d at 611. Here although Ogden ques-

tioned Green about his possible involvement in the armed robbery and his reasons for smuggling drugs to Bailey, there were no questions ever posed about Green's sentence or the circumstances which led him to testify (e.g., whether a plea agreement was reached). *See* T.13 at 15:25–17:05, 35:30–38:10, 3/12/86; T.17 at 4:31–5:22, 3/13/86. Nor was Green closely scrutinized about the circumstances by which he was permitted to meet with Bailey while they were both in jail following Green's arrest. T.13 at 35:38–37:45, 3/12/86.[7] Such omissions, though possibly innocent or explainable, nonetheless demonstrate likely areas in which Ogden would be hindered in cross-examining his former client.

In *Bowie*, we recognized that " '[a]ctual conflict' and 'adverse effect' are not self defining phrases." *Id.* at 1500. We are aware that "there is no per se rule prohibiting representation of a defendant by counsel who has previously represented a government witness in a related case[.]" *Id.* However, in the context of successive representations, we find it difficult to envision circumstances more fraught with inherent conflict than where an appointed attorney representing a reluctant defendant must present a defense theory inculpating the attorney's former client, particularly where the former representation was factually intertwined with the criminal defendant's case. *See, e.g., Bowie*, 892 F.2d 1502 (noting "the potential for conflict is great where there is a substantial relationship between the cases"). Here we feel that Church has demonstrated an actual conflict of interests.[8]

---

7. Nor is it disputed that Bailey also received certain special privileges while incarcerated. On at least one occasion, her jailer purchased carry-out fast food for her, and Sheriff Darnell loaned her money for unspecified purposes. *See* T.12 at 44:35–45:05, 3/12/86; T.17 at 13:00–14:08, 3/13/86.

8. We are aware that in *Smith v. White*, 815 F.2d 1401 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987), a case with many factual similarities to this one, the Eleventh Circuit refused to find an inherent conflict when defense counsel had previously represented "the most likely other suspect[.]" *Id.* at 1404–07. There, however, the former represen-

tation, involving a marijuana conviction, was not "substantially related to [the attorney's] later representation of petitioner[.]" *Id.* at 1406. Here, Green's testimony shows a close connection between the two representations. Moreover, the *Smith* opinion does not reveal whether Smith's trial theory sought to show that the former client was really the guilty party. These facts make *Smith* distinguishable.

Finally, to the extent that the *Smith* holding relies on the Eleventh Circuit's view that "it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so[,]" *id.* at 1405, we feel this view is inconsistent with our holdings in *Winkle* and *Bowie*.

We cannot dismiss Church's claim, as did the court below, merely because the state trial court may have been aware of the former representation. First, we are unable to find support in the record for the magistrate's determination that the trial court was informed of the details of Ogden's former representation of Green. I R., Doc. 47 at 5. Indeed, of record, the former representation is mentioned only once. There, Ogden states, in passing, that "Kelly Green has, [sic] I represented him on that thing, and 'he's gained weight." T.16 at 6:20–6:37, 3/12/86.[9] The State argues and the magistrate found that the trial court was aware of the potential conflict. If this were the case, we note that *Cuyler* "*mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood v. Georgia*, 450 U.S. 261, 272 n. 18, 101 S.Ct. 1097, 1104 n. 18, 67 L.Ed.2d 220 (1981) (quoting *Cuyler*) (emphasis in original); *see Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir.1991). However, we do not believe that the circumstances were sufficient "to alert the trial court to a potential conflict[.]" *Id.* at 555. As a federal habeas court we presume the propriety of state court proceedings until shown otherwise. Thus, we cannot say that the state trial court should have known of the conflict as a result of Ogden's sole, unspecified reference to "that thing."

■ In any event Ogden's cross-examination of Green was not sufficient to cure the conflicting representation of taint. As shown by our disposition in *Bowie*, the mere fact that cross-examination might appear "vigorous" does not necessarily expunge this aspect of the constitutional error. *See id.* at 1502. Rather, the dangers inherent in successive and multiple representations do not become apparent merely by scrutinizing what the attorney did: "representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing." *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978). The apparent "vigor" of cross-examination is but a factor to be considered in determining whether a conflict adversely affected counsel's performance. Thus, *Bowie* created a test which holds that defense counsel's former, conflicting representation adversely affected his performance "if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests." *Id.* at 1500. As noted, the record in this case is insufficient to resolve the factual issue of "adverse affect." In *Bowie*, where there had been no inquiry into possible conflicts, we remanded for an evidentiary hearing. *See id.* at 1500, 1502. We do so here on the adverse effect question.

On remand, the district court should determine whether either of two waivers occurred because if Green "waive[d] his attorney-client privilege, then any potential conflict is removed[,]" and further, Church may have "waived his right to counsel free of such conflicts." *Bowie*, 892 F.2d at 1502; *see also Holloway*, 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5 ("a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests"). There is no mention that Church was ever apprised of the conflicting representation before trial, and an evidentiary hearing should resolve this key concern.

If the district court finds that Church's representation was adversely affected by the conflict and that there was no valid waiver, the court should fashion a remedy

---

**9.** During a recess in the trial, a juror had asked the trial judge if both Green and Church could stand together before the jury so that their physiques could be compared with the description of the third robber. Ogden's remark about a "representation" came during an objection to this in-court show-up, and reads in full:

> Your honor, I think it takes on the aura of a lineup. Kelly Green has [sic], I represented

him on that thing, and he's gained weight. I think there'd be, [sic] the probative value, [sic] would be prejudicial, irrelevant. I think the jury would draw the wrong inferences. *Id.* at 6:20–6:46. We are unable to find any other references to the former representation anywhere else in the New Mexico proceedings.

"as law and justice require." 28 U.S.C. § 2243; *see, e.g., Bromley v. Crisp,* 561 F.2d 1351, 1364 (10th Cir.1977) *(en banc)* (constitutional defects found on habeas review may be remedied by further proceedings), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499 (1978); *Martinez v. Turner,* 461 F.2d 261, 265 (10th Cir.1972).

### 2. *Failure to Prepare*

■ Although we remand the conflict issue for an evidentiary hearing, we affirm the district court's ruling and the magistrate's conclusion that Church did not show ineffectiveness of counsel by his failure to prepare for trial. As the magistrate noted, to establish this claim Church must satisfy the *Strickland v. Washington* standard by showing "(1) the assistance of his counsel was outside the bounds of professional conduct; and (2) that petitioner was actually prejudiced by his counsel's deficient performance." I R., Doc. 47 at 6 (citing *Strickland,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)).

Church argues that Ogden was inadequately prepared because he failed to listen to the preliminary hearing tapes before presenting Church's motion to suppress. As a result, Ogden twice failed to impeach Sheriff Darnell's claim that he never told Church that Laura was a suspect in this case.[10] Church also claims that Ogden's performance was constitutionally infirm because he failed to highlight to the jury the inconsistencies between the Wilsons' preliminary hearing and trial testimony concerning the date that Hernandez first visited the Wilson home.

We need not address whether Ogden's performance fell below the standard of reasonable professional norms because we agree with the conclusion below that Church has "failed to show ... [that his] defense was prejudiced in any way by some deficient performance on the part of his counsel." I R., Doc. 47 at 6. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069 (noting that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies"); *United States v. Taylor,* 832 F.2d 1187, 1194–95 (10th Cir. 1987) (same).

As we have noted before, "the mere failure to cross-examine a witness does not necessarily require a finding of ineffective assistance of counsel." *United States v. Miller,* 907 F.2d 994, 1002 (10th Cir.1990). Although we do not condone Ogden's failure to review the preliminary hearing tapes before the motion to suppress hearing, we cannot say that Church was prejudiced thereby. Moreover, Church concedes that Ogden did listen to the tapes before the trial, *see* Appellant's Brief at 47. We also see no prejudice in Ogden's failure to "impeach" Darnell or the Wilsons on these points. At the preliminary hearing, Darnell was asked whether he had ever indicated to Church that Laura was a suspect. He replied: "I'm not sure.... I may have, I don't know." T.5 at 28:35–28:58, 8/30/85. Later, at the suppression hearing, Church rebutted Darnell's claim with his own recollection of the earlier preliminary hearing testimony. *See* T.3 at 16:25–17:45, 21886.

Recognizing that New Mexico law permits using prior inconsistent statements as substantive evidence, *see Tapia v. Tansy,* 926 F.2d 1554, 1561 n. 12 (10th Cir.1991) (citing *State v. Maestas,* 92 N.M. 135, 143, 584 P.2d 182 (Ct.App.1978)), nevertheless, we view this equivocal testimony at the preliminary hearing as weak impeachment material, at best. By itself, it fails to undermine our confidence in the fairness of Church's trial. Further, the fact that the Wilsons misstated the date of Hernandez' pre-robbery visit to their home does not undermine their credibility as to the events of the night of the robbery. Church bears the burden of demonstrating how more extensive cross-examination of Darnell or the Wilsons might have changed the outcome of this trial. *See Miller,* 907 F.2d at 1002; *United States v. Voigt,* 877 F.2d 1465, 1468 (10th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989). He has not carried that burden.

---

**10.** The significance of this testimony is discussed more fully in Part II D, *infra.*

### 3. *Right to Act as Co-counsel*

The third prong in Church's ineffective assistance claim is unpersuasive. Church argues that because Ogden was not present at the preliminary hearing, the trial court erred in denying Church the right to act as co-counsel. While Church "had a right to conduct his own defense under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), he had no right to some sort of 'hybrid' representation where he acted as co-counsel." I R., Doc. 47 at 4 (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984)). *Accord United States v. Treff*, 924 F.2d 975, 979 (10th Cir.1991) (no error in trial court's refusal to allow represented defendant to cross-examine witnesses), *cert. denied,* — U.S. —, 111 S.Ct. 2272, 114 L.Ed.2d 723 (1991). As noted above, Church was permitted to testify about his memory of the preliminary hearing testimony.

### D. Voluntariness of Confessions

Both Church and Darnell testified in state court at a motion to suppress hearing about the circumstances surrounding Church's confessions.[11] Church said that during an interview at the jail, Darnell accused him of lying and sent him back to his cell after he denied any involvement. *See* T.1 at 1:55–250, 2/18/86. Later, when questioning resumed, Church claims Darnell threatened to arrest his fiance, Laura. Continuing to protest his innocence, Church then conceded that he had been aware of the scheme, but had only agreed to sell the stolen property. He also admitted replacing the jeep tire that was damaged when the robbers fled. Darnell, however, insisted that Church "make a convincing statement" or else Laura would be arrested on aiding and abetting charges. *Id.* at 5:02–5:25, 7:50–9:10, 11:30–12:05.

When Church agreed to confess, Darnell briefed him on the full facts of the robbery, giving him a copy of Green's and Bailey's statements and the affidavit accompanying Church's arrest warrant. Church also contends that Darnell further induced the confessions by promising to return to Laura the jeep, her only mode of transportation, and by promising to return Laura's photographs and fingerprints to her. *Id.* at 5:02–5:15, 9:20–9:50. Later that evening, Church asked Darnell for an opportunity to speak to Laura before making a full statement. Darnell agreed, and took Church home. After an emotional discussion with Laura in which Church told her that he had to confess to protect her, Church gave a full tape-recorded statement to Darnell at the kitchen table. The jeep was returned to Laura the following day and the photographs and fingerprints were returned to her some time later. *Id.* at 9:57–11:25.

Darnell denied making any threats or promises to induce the confessions. Moreover, he asserted that there was no probable cause for him to believe that Laura was involved. *Id.* at 30:00–31:50, 37:30–37:55; T.2 at 00:30–00:50, 37:15–37:40, 2/18/86. Darnell acknowledged that he gave Church copies of the statements and affidavits which led him to suspect Church's involvement. So confronted, Darnell said that Church initially gave a limited statement admitting his role in the plan to sell the stolen goods, but later that evening Church asked that Darnell return for a more complete statement. When Darnell arrived, Church asked to speak to Laura before giving a full statement. Darnell agreed and transported Church home where, at Darnell's request, Laura turned over a handgun which was later identified as the robbery weapon. Darnell permitted Church and Laura to speak semi-privately—under visual observation only—after which, Church made a full confession. T.2 at 2:30–17:25. Darnell concedes having returned the jeep to Laura the next day despite his belief that the jeep constituted evidence in the case, indicating that she agreed to make it available when needed, and that he thus avoided the problem of

---

11. Deputy Sheriff Diaz also testified at this hearing. However, a review of her testimony shows that she was in the adjacent police dispatcher's room at the Ruidoso jail during all the time that Darnell questioned Church and was unable to hear any of the disputed conversation. *See* T.3 at 5:26–16:25, 2/18/86.

transporting it to Lordsburg for the trial. He also acknowledged that the photos and fingerprints were returned to Laura sometime later. *Id.* at 18:30–20:25, 41:25–42:30.

At the end of the suppression hearing, at which Church's counsel was permitted to cross-examine Darnell thoroughly, the state trial court denied the motion to suppress. The judge's ruling, in full, states:

Well, if you get a case, which almost never happens, it seems like, where there's no conflict in the testimony surrounding an admission or confession, then the court can make a ruling as a matter of law: yes, this is and should be suppressed or this can be admitted without even an instruction to the jury. But what I've heard all day is a big conflict in the testimony. If I, [sic] if it were exactly like Mr. Church said, I wouldn't have much problem suppressing the statement. But there is a conflict in testimony, and writers of U.J.I. [Uniform Jury Instructions] criminal recognize that we do get conflicts. U.J.I. 40.40 states as follows: "Evidence has been admitted concerning the statement allegedly made by the defendant. Before you consider such statement for any purpose you must determine that the statement was given voluntarily. In determining whether a statement was voluntarily given you should consider if it was freely made and not induced by promise or threat."

Other case law, *State v. Ramirez,* 89 N.M. 635 [556 P.2d 43], where the judge on record passed on the voluntariness and admissibility at a suppression hearing and submitted the statements to the jury with a charge which complied with this instruction, the defense argument that his statements were the product of promises and inducement was to be considered with all the conflicting evidence and it was not for the appellate court to substitute its own judgment for that of the trier of fact and the trial judge. So, in the end it's up to the jury that's going to decide whether or not this was a vol-

untary statement and whether or not there were any promises or inducement.

*The court preliminarily will find that the statement was voluntarily [sic], voluntary and admissible for consideration of the jury but subject to the, [sic], all the evidence that might be produced in that connection and the jury instruction which I've just read to you. Therefore the court would, at this time, deny the motion for suppression.*

(T.3 at 25:05–27:45, 2/18/86) (emphasis added).

After reviewing the record, the federal magistrate considering Church's habeas petition rejected Church's claim that his confessions were involuntary. No evidentiary hearing was held. The magistrate first focused on the trial court's mention of the conflict in testimony at the suppression hearing. The magistrate then noted that the jury was properly instructed on voluntariness before it found the statements voluntary. Thus, the magistrate concluded that "the admission of petitioner's statement[s] into evidence at his state court trial was proper." *See* I R., Doc. 47 at 3, ¶¶ 5–8.[12]

On appeal, Church argues that the federal district court erred in failing to hold an evidentiary hearing on the voluntariness of his post-arrest statements. Church contends that the State failed to provide him a full and fair hearing in which the trial court made an independent determination of voluntariness before permitting the question to go to the jury, as required by *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The trial court's ruling, Church argues, shows that "the trial judge in this case evidenced a misunder-standing [sic] of his role in the voluntariness determination." Appellant's Brief at 25. Because the state trial court "refused to make a credibility choice and instead decided to leave the voluntariness decision to the jury[,]" *id.* at 26, the district court was obligated to hold an evidentiary

12. We do not read the magistrate's conclusion as relying upon the jury's determination of voluntariness to justify admission of the confes- sions. *Jackson v. Denno,* cited by the magistrate, clearly forbids such a conclusion. *See id.,* 378 U.S. 368, 382–91, 84 S.Ct. 1774, 1783–89.

hearing under *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

We agree that the facts Church testified to in his suppression hearing, if true, might entitle him to suppression of the statements. *See United States v. Chalen,* 812 F.2d 1302, 1307–08 (10th Cir.1987) (describing factors relevant to assess voluntariness); *Martin v. Kemp,* 760 F.2d 1244, 1248–49 (11th Cir.1985) (unfounded threats to prosecute wife constitute coercive conduct); *Ferguson v. Boyd,* 566 F.2d 873, 877–79 (4th Cir.1977) (threats to "live-in" girlfriend coercive). Thus, under *Townsend,* we must determine whether Church "receive[d] a full and fair evidentiary hearing in the state court, either at the time of the trial or in a collateral proceeding." *Id.,* 372 U.S. at 312, 83 S.Ct. at 757.

In *Jackson,* the Court held that "[a] defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." *Jackson,* 378 U.S. at 380, 84 S.Ct. at 1783. This determination "requires facing the [voluntariness] issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence." *Id.* at 390, 84 S.Ct. at 1788. The Due Process Clause requires that the states ensure that "the trial judge, another judge, or another jury, but not the convicting jury, fully resolves the issue of voluntariness" before a confession is admitted in evidence. *See id.* at 391 & n. 19, 84 S.Ct. at 1788–89 & n. 19.

In *Townsend,* the Court explained that "if no express findings of fact have been made by the state court, the District Court must initially determine whether the state court has impliedly found material facts." *Id.* 372 U.S. at 314, 83 S.Ct. at 757. Moreover, the Court said:

> If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia.

*Id.* Although *Townsend* may require a federal court to search for implicit factual findings, the facts so found must not be the result of speculation or surmise: "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." *Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1966).

We are convinced that the state trial court clearly found the statements "voluntary and admissible," T.3 at 27:25–27:45, 2/18/86, although the judge did not expressly state the facts supporting his conclusion. Thus, *Townsend* requires that we attempt to "reconstruct" the facts, if possible, from the state court ruling. If the necessary facts are implicit in the state court's ruling, the federal district court was not required to hold an evidentiary hearing, though it remained within its discretion to do so. *See Townsend,* 372 U.S. at 318, 83 S.Ct. at 759–60; *Cranford v. Rodriguez,* 512 F.2d 860, 862–63 (10th Cir. 1975); *see also Phillips v. Murphy,* 796 F.2d 1303, 1304 (10th Cir.1986) (no evidentiary hearing required where factual dispute resolved).

We review the ultimate conclusion on the voluntariness of Church's post-arrest statement under a *de novo* standard. *See Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985). However, "[e]xplicit and implicit [factual] findings by state trial and appellate courts" are presumed correct under 28 U.S.C. § 2254(d) unless one of the statute's exceptions applies, or the findings are not fairly supported by the record. *Case v. Mondragon,* 887 F.2d 1388, 1392 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1490, 108 L.Ed.2d 626 (1990). Moreover, the "subsidiary factual question" of whether "the police have engaged in the intimidation tactics alleged" is also entitled to the presumption. *Miller,* 474 U.S. at 112, 106 S.Ct. at 450. Lastly, we treat a state court finding regarding witness credibility as a finding of fact. *See Mondragon* at 1393.

Although the state trial record raises some concern, we believe the state trial judge impliedly made the requisite credibility determination before concluding that Church's statement was voluntary and admissible. *See Marshall v. Lonberger*, 459 U.S. 422, 433, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973) (per curiam); *Cranford v. Rodriguez*, 512 F.2d 860 (10th Cir.1975). The judge was plainly aware of the correct constitutional standard as shown by his reference to New Mexico U.J.I. 40.40 and his quotation from *State v. Ramirez*, 89 N.M. 635, 556 P.2d 43, 47–48 (Ct.App.1976), *overruled on other grounds, Sells v. State*, 98 N.M. 786, 653 P.2d 162 (1982), which together, adequately state the law concerning the voluntariness of a confession. *See Townsend*, 372 U.S. at 314, 83 S.Ct. at 758 (noting that reconstruction is only possible where correct constitutional standard was used). Moreover there were only two versions of the events before the judge—Darnell's and Church's. The judge said that if the facts surrounding the confession *"were exactly like Mr. Church said, I wouldn't have much problem suppressing the statement."* (T.3 at 25.20–25.25, 2/18/86) (emphasis added). Accordingly, this is precisely the sort of case where we "can be reasonably certain that the state trier would have granted relief if he had believed petitioner's allegations[.]" *Townsend*, 372 U.S. at 315, 83 S.Ct. at 758.

We reject Church's argument that the state trial judge misunderstood his role as the initial trier of the voluntariness issue. The judge referred directly to the *Ramirez* decision, which quotes the exact passage of *Jackson v. Denno* invoked by Church as the proper procedure. Admittedly, the judge's statement that "in the end its up to the jury ..." is confusing, and should not have been mentioned before the court ruled on voluntariness. Yet, in context, this statement does not undermine our conviction that the court understood its role and was in accord with the constitutional requirements of *Jackson*.

We are persuaded that the state trial court made an implicit factual finding that Darnell was more credible than Church. Accepting Darnell's testimony and applying the necessary presumption of correctness, we feel the state court was warranted in admitting the statements. Church failed to tender to the district court convincing evidence that one of the § 2254(d) exceptions applies. The only evidence Church intends to present at an evidentiary hearing is his own testimony contradicting Darnell's version of events, and jail logs and preliminary hearing transcripts apparently offered to impeach Darnell. *See* Defendant's Tender of Evidence To Be Presented At Evidentiary Hearing, filed 12/15/88. None of this is new or sufficient to overcome the presumption of correctness. The record fairly supports the state court's finding.

Accordingly, the federal district court acted within its discretion in refusing to grant an evidentiary hearing because the "state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend*, 372 U.S. at 313, 83 S.Ct. at 757.[13] The rejection of the constitutional challenge to the confessions was not error.

### E. Improper Venue

Before jury selection, Church moved, *pro se*, for a change of venue from Hidalgo County, New Mexico. The state trial court granted Church an evidentiary hearing where he testified that venue was improper because the community had been exposed

---

**13.** During the pendency of this appeal, the Supreme Court decided *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), in which a majority of the Court determined that the admission of a coerced confession is susceptible to a harmless error analysis. *See id.* 111 S.Ct. at 1263–66. Accordingly, by order of this court, the parties filed supplemental, post-argument briefs on the impact of that decision. We agree with both parties' analyses that the *Fulminante* harmless error rule does not apply retroactively to collateral review cases because it creates a "new rule" within the meaning of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and does not fit within any of the *Teague* exceptions. Our disposition of Church's coerced confession claim, however, obviates the need to further elaborate on the supplemental arguments presented.

to inflammatory publicity about the crime. Specifically, Church said that friends had informed him of a locally circulated El Paso Times newspaper article in which Sheriff Darnell expressed his belief in Church's guilt. According to Church, Darnell's authority is so respected by Hidalgo County residents that Church would not be able to receive a fair trial following this statement. *See* T.1 at 6:20–13:15, 2/6/86. The trial court reserved judgment on the motion until after a jury was selected.

A state trial court's findings of jury impartiality may be overturned by a federal habeas court only for manifest error. *Mu'Min v. Virginia,* — U.S. —, 111 S.Ct. 1899, 1907, 114 L.Ed.2d 493 (1991) (quoting *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984)). In a federal habeas case, *Patton* considered a state trial court's finding that a jury panel as a whole was impartial; the Court held that the state court did not commit "manifest error" in so finding. *Id.* at 1032, 104 S.Ct. at 2889. *Patton* distinguished that conclusion from a federal habeas court's function in reviewing state court findings on the partiality of *individual* jurors, which findings *Patton* held to be entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 1036, 1040, 104 S.Ct. at 2891, 2893. Here we are called on to consider the former type of a state court ruling made in denying a motion for a change of venue—namely a general finding that the final panel which heard Church's trial was impartial. Hence we will apply the "manifest error" standard of review recently followed in *Mu'Min.*

During the *voir dire,* conducted by the judge and also counsel there was both general questioning of the jury panel, of juror groups, and of individual jurors. Church's brief specifically notes that one of the jurors, Mrs. Sanchez, had read about the case and was very uncertain whether she could be impartial. As we understand the tape, which is frequently unintelligible, at one point the district attorney asked whether she could be impartial. He then states that she had shaken her head "no." T.3 at 19:11–19:30, 3/11/86. In chambers, Church's attorney challenged Mrs. Sanchez for cause, arguing that her responses to questions about being impartial were conflicting; that the responses indicating that she had made up her mind from what she had read were stronger than her other responses; and that she finally said she guessed she could be impartial, or some similar statement. T.1 at 18:45–18:57, 3/11/86. The trial court denied the challenge for cause as to Mrs. Sanchez. Church's attorney did not exercise a peremptory challenge to Mrs. Sanchez when he had that opportunity, although eventually he used all his peremptories.

The trial judge denied the renewed motion for change of venue. In so doing he stated that they had been able to find twelve impartial jurors and one alternate in approximately two hours. *Id.* at 31:00–31:20. This ruling and its accompanying statements constitute, in our opinion, a general finding that the panel selected for the trial was impartial. This finding is subject to the "manifest error" standard referred to in *Patton,* 467 U.S. at 1031, 104 S.Ct. at 2889, and *Mu'Min,* 111 S.Ct. at 1907.[14]

Considering the whole of the record, although it is of inferior quality, we do not believe that the judge's finding can be disregarded. The evidence of an out-of-state newspaper article and the unsubstantiated testimony of Church that Hidalgo County

---

**14.** We are constrained to note that consideration of this important record has been impeded by the inferior quality of record presented. The cassette tapes are poor in many instances, and critical responses by jurors are often totally inaudible. We have been obliged to piece together what appears to be their content from statements of counsel or inferences from the court's remarks.

This record has materially delayed this opinion and has caused us serious concern as to the fairness of the record to both parties. Had a court reporter been used, creating a written record to study, the procedure would have been infinitely fairer to all parties and our disposition would have been considerably expedited. Additionally, a written record would have greatly simplified the identification of jurors in the record.

residents would accept, without question, the word of their sheriff is insufficient to overturn the trial court's conclusion that the jury was impartial.[15] *Cf. Irvin v. Dowd,* 366 U.S. 717, 719–20, 81 S.Ct. 1639, 1641, 6 L.Ed.2d 751 (1961) (intensely publicized press releases issued by police officials and prosecutor noting defendant's pretrial confession to six area murders) with *Hickock v. Crouse,* 334 F.2d 95, 98, 101–102 (10th Cir.1964) (large crowd attending arrival of suspects following newspaper, radio, television coverage of arrests and confessions), *cert. denied sub nom, Smith v. Crouse,* 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965). The state trial judge had the benefit of observing the demeanor of the jurors as the basis for his general finding. We are not persuaded that Church has borne the burden of showing "manifest error" in the judge's finding.

In sum, we uphold the rejection of Church's due process argument on the venue issue.

### F. Sufficiency of the Evidence

 Finally, Church challenges the sufficiency of the evidence as inadequate to convict him. We are not persuaded. The constitutional standard for determining the sufficiency of the evidence is whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In addition to the direct and circumstantial proof presented at trial and noted in the magistrate's report, *see* I R., Doc. 47 at 8 and record citations therein, we need only add that Church's confession, found to be voluntary, was corroborated by other evidence at trial. This was more than adequate to convince a rational trier of fact of Church's guilt.

### III.

### Conclusion

In sum, we REVERSE the district court's determination that Church's due

process claims of jury misconduct and inconsistent testimony were procedurally defaulted. We REMAND the jury misconduct claim for further proceedings by the federal district court. Further, we REVERSE the district court's determination that there was no actual conflict of interests in the successive representations in this case and REMAND for an evidentiary hearing on that claim. Finally, we AFFIRM the district court's denial of Church's petition for a writ of habeas corpus in all other respects.

IT IS SO ORDERED.

---

15. Although some of the jurors read local newspaper accounts of the crime, notably no jurors claimed to have read the offending El Paso Times news story.