Willie ENOCH, Petitioner–Appellant,

v.

Richard GRAMLEY, Warden, Pontiac Correctional Center, Respondent–Appellee.

No. 94–3470.

United States Court of Appeals, Seventh Circuit.

Argued June 13, 1995.

Decided Nov. 16, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 5, 1996.[*]

---

\* Circuit Judge Joel M. Flaum took no part in the consideration of this case.

Sheri J. Engelken (argued), Paul R. Garcia, Paula M. Taffe, Kirkland & Ellis, Chicago, IL, Marshall J. Hartman, Chicago, IL, for Petitioner–Appellant.

Penelope Moutoussamy George (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before RIPPLE, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The mutilated body of Armanda Kay Burns was found in her apartment after Willie Enoch left that building. She had been cut from the sternum to the naval leaving an open chest cavity. She also suffered throat lacerations and numerous stab wounds. Her hands had been manacled behind her with coat hanger wire. Enoch stands convicted of the murder, attempted rape, and kidnapping of Kay Burns. We review here the district court's denial of Enoch's 28 U.S.C. § 2254 petition for *habeas corpus* relief.

Enoch alleges that he was deprived of his constitutional right to conflict-free trial counsel, that self-incriminating statements were unconstitutionally disclosed to the jury that convicted him, and that he was unconstitutionally denied meaningful direct appellate review of his conviction. We affirm the decision of the district court.

## I. Factual Background

Armanda Kay Burns was a twenty-five year old housekeeping supervisor at the Methodist Medical Center in Peoria, Illinois. She lived in a basement apartment at 105 North Glen Oak Road, approximately one block from the medical center where she worked. On Thursday, April 21, 1983, Kay Burns sat in her bedroom with her boyfriend Derek Proctor watching television. They heard someone at the door, and Ms. Burns went to answer it. Proctor observed that the visitor was Willie Enoch, who asked Kay Burns if she knew his brother Bobby. Enoch left after a very brief exchange.

On Friday, April 22, 1983, Ms. Burns worked the 3:00 p.m. to 11:45 p.m. shift at the medical center. At about 11:30 that night, she and several of her staff were gathered in her office when Willie Enoch entered and asked if anyone had seen his brother Bobby. Enoch was told that his brother Bobby (a hospital employee) was not working that evening, and Enoch then struck up a conversation with Ms. Burns.

As two members of her staff left the hospital following the end of the shift, they observed Ms. Burns and Enoch walking together toward her apartment. Gregory Hunter,

one of the staffers, saw them together as he drove down Glen Oak Road. He blew his horn (apparently as a friendly gesture), and Ms. Burns waved to him. Michael Callen, the other staffer who saw Ms. Burns and Enoch together, spotted them standing about one hundred feet from Ms. Burns' apartment as he drove down Glen Oak Road. Hunter testified that Enoch was wearing a dingy white shirt and a blue pinstriped suit; Callen said Enoch wore a dark blue suit.

Kay Burns had plans to meet Derek Proctor and her brother and sister-in-law at midnight. According to his testimony, Proctor arrived at Ms. Burns' apartment at 11:45 p.m. and rang the bell several times. He got no response, but he noticed that the kitchen light was on. Proctor sat on the sidewalk in front of the apartment for five or ten minutes and then walked to the hospital in hopes of finding Ms. Burns. He did not find her, but he spoke with a security guard and checked Ms. Burns' time card to see if she had clocked out. He also called her apartment from a pay phone, but got no answer.

Proctor then returned to Ms. Burns' apartment and again rang the bell for four to ten minutes, again to no avail. He crossed the street to buy cigarettes at the Glen Oak Towers, returned a few minutes later, and rang the bell again. Getting no response, he sat down on the curb. He heard the door open five minutes later, at approximately 12:45 or 12:50 a.m., and turned to face it, saying, "Damn, Kay, what took you so long?" Instead of greeting Ms. Burns, however, Proctor saw Enoch leaving Ms. Burns' building carrying a white or off-white shirt in his hands. Proctor asked Enoch if Kay Burns was in her apartment, and Enoch replied, "Yes, she's down there." Enoch left, and Proctor tried the bell again, but receiving no answer he went after Enoch, who he saw running across an open field near the medical building. Proctor did not catch him.

Proctor returned to Ms. Burns' apartment, rang the doorbell, and knocked on the windows. He saw that the lights in the kitchen and bedroom were on. Proctor went to telephone her mother from the nearby Glen Oak Towers, got no answer, returned to the apartment, rang the doorbell, again got no answer, and went to look for Enoch at several clubs in the area. Proctor eventually returned to Ms. Burns' apartment and, still getting no answer to his persistent ringing of her doorbell, he got a ride to her brother's home. Proctor woke Ms. Burns' brother, Tyrone, and his wife, Caroline, and the three drove to Kay Burns' apartment, arriving at approximately 2:15 a.m.

They received no response to their knocks, and the door remained locked. Proctor then kicked in the basement window, which opened into Kay Burns' bedroom and was about two feet from the door. Pushing the window in further, Proctor saw her body on the bedroom floor. Caroline and Tyrone Burns went for help while Proctor remained at the window.

While Caroline and Tyrone were gone, Randy Purifoy, a Methodist housekeeping staffer, and his friend Anthony Gibson drove by and spoke to Proctor, whom they found stuttering and in tears. Purifoy saw Ms. Burns' body, but no one entered the building until the police arrived and began their investigation.

Officer Ledbetter of the Peoria police department arrived on the scene at about 2:56 a.m. He met Proctor, Purifoy, and Gibson, all of whom were upset, especially Proctor, who was crying. Ledbetter entered the apartment and found Kay Burns' tortured and lifeless body on the bedroom floor. Another officer retrieved a white shirt from a location a short distance from the sidewalk in front of Kay Burns' apartment.

At 7:30 that morning, police officers went to the home of Louise Pate looking for her boyfriend, Willie Enoch, in connection with the murder of Ms. Burns. Pate told the officers that Enoch was not there, but the officers saw Enoch and arrested him. Pate told a grand jury that Enoch had confessed to her that he had committed the murder. She later attempted to change her story, but she eventually testified at Enoch's trial that, in fact, Enoch had confessed to her and that her interim statement to the contrary had been a lie.

## II. Prior Proceedings

A jury convicted Enoch of kidnapping Kay Burns, of attempting to rape her, and of murdering her. It acquitted him, however, of robbing her. Enoch waived jury sentencing, and the judge sentenced him to death. The Illinois Supreme Court affirmed. *People v. Enoch*, 122 Ill.2d 176, 119 Ill.Dec. 265, 522 N.E.2d 1124 (1988), *cert. denied*, 488 U.S. 917, 109 S.Ct. 274–75, 102 L.Ed.2d 263 (1988) (*"Enoch I"*) It later affirmed a lower court's denial of Enoch's petition for post-conviction relief. *People v. Enoch*, 146 Ill.2d 44, 165 Ill.Dec. 719, 585 N.E.2d 115 (1991), *cert. denied*, 506 U.S. 816, 113 S.Ct. 57, 121 L.Ed.2d 26 (1992) (*"Enoch II"*). Enoch then filed this petition with the district court.

## III. Analysis

### A. Whether Enoch's Counsel Was Free from Conflicts of Interest

Enoch argues that at trial he was deprived of his constitutional right to conflict-free counsel. Enoch claims that his lawyer, Mark Rose, had previously represented a key government witness, Derek Proctor, in an unrelated criminal matter four years earlier.

Before Enoch's trial, Rose brought his previous representation of Proctor to the attention of the court. He had forgotten about the relationship until he reviewed Proctor's rap sheet and noticed the conviction for which Rose had represented Proctor. The court conducted the following inquiry:

THE COURT: Mr. Rose, do you feel that the existence of your prior relationship with this proposed witness would cause you any difficulty insofar as your representation of the defendant, Willie Enoch?

MR. ROSE: I don't believe so, your honor.

THE COURT: Has there been any ongoing relationship of attorney-client between you and Mr. Proctor?

MR. ROSE: Only that I believe Mr. Proctor has been in the office, and I believe it is since the date of this, although I can't be sure, concerning possibly hiring me to represent him in matters. But so far as I recall, never represented him privately, and, I believe, this may be the only occasion that, in fact, I represented him.

THE COURT: There is no attorney-client relationship, is that right?

MR. ROSE: That's correct.

THE COURT: To the best of your recollection—I don't mean to put words in your mouth—but my understanding is, to the best of your recollection, your attorney-client relationship with Mr. Proctor ended with the conclusion of this 1979 case; is that right?

MR. ROSE: I believe so. I don't recall representing—in fact, to be very truthful, I didn't remember representing him in that case until I procured the Certified Copy of Conviction this morning.

THE COURT: Do you have any specific recollection of your representation of Mr. Proctor?

MR. ROSE: Now, I do.

THE COURT: Are they recollection, or do you just know it from the fact?

MR. ROSE: No, I recall the incident, and I recall the codefendant in this case.

THE COURT: Just to be clear, that relationship ended in 1979; is that right?

MR. ROSE: I believe it would have ended July 30.

THE COURT: And you don't feel you're affected—

MR. ROSE: Excuse me, probably August 2.

THE COURT: 1979?

MR. ROSE: Yes.

THE COURT: You don't feel your effectiveness is impaired in any way; is that right?

MR. ROSE: No.

THE COURT: Any comments, Mr. State's Attorney?

MR. BARRA: No, your honor.

THE COURT: The court would find that this state of affairs that has just been described for the record does not constitute a conflict of interest nor, in fact, does any conflict of interest exist based on the

page number

representations by Mr. Rose, which are amply supported by the record.[1]

Despite the court's finding, Enoch argues, Rose had an inherent conflict in that he owed a duty not to disclose confidences he had learned during his representation of Proctor, and this duty prevented Rose from vigorously cross-examining Proctor about his past crimes in order to impeach his credibility. Enoch also contends that, because Proctor was the only other suspect in this crime, the question of Rose's loyalty to Proctor raises the specter that Rose may not have sufficiently focused the jury's attention on Proctor as the real murderer. On the basis of the facts contained in the record and the briefs submitted by counsel, the district court found that Rose had no conflict.

As this is a mixed question of law and fact, we review it *de novo*. *Griffin v. Camp*, 40 F.3d 170, 172 (7th Cir.1994). State court findings of fact, however, require our deference and are presumed correct unless they fall within one of eight exceptions. 28 U.S.C. § 2254(d).

■ In order to show that he was deprived of his Sixth Amendment right to conflict-free counsel, Enoch must proceed on one of two theories: either that his attorney had a potential conflict of interest that prejudiced his defense, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or that his lawyer had "an actual conflict of interest adversely affect[ing] his [ ] performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

Most defendants seek relief under *Cuyler* because it is easier to demonstrate "adverse impact" than prejudice, a standard that requires the petitioner to show that there is a reasonable probability that, but for the conflict, the defendant would not have been found guilty. *Stoia v. United States*, 22 F.3d 766, 770–71 (7th Cir.1994). An adverse impact is merely conduct by the attorney contrary to the defendant's interests caused by the attorney's conflict. *Id.* at 771.

Enoch proceeds under the *Cuyler* standard. Conflicts typically arise where a lawyer engages in simultaneous representation of codefendants in a criminal case because exculpating one client may depend on inculpating the other. However, they may also arise in cases of successive representation, though "it is generally more difficult to demonstrate an actual conflict resulting from successive representation." *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988).

In cases of successive representation, conflicts may arise "if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Id.* A corollary danger is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information. *United States v. Agosto*, 675 F.2d 965, 971 (8th Cir.1982); *Ross v. Heyne*, 638 F.2d 979, 983 (7th Cir.1980).

The Eleventh Circuit has held that, "in a successive representation case, mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish [an actual conflict]." *Smith v. White*, 815 F.2d 1401, 1405 (11th Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987). The court established two scenarios in cases of successive representation where the defendant may show that his attorney had an actual conflict:

(1) [Where] counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) [where] counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case.

*Id.* In addition, either showing will merely allow a petitioner to proceed with his claim; one showing or the other is necessary, but not sufficient. *Id.* at 1406.

1. The court did not address Enoch regarding the matter. Had the court found that a conflict existed, it would have been required to ask Enoch whether he waived that conflict. In this case, the court might have inquired as to Enoch's position on the matter, but it was not required to do so absent a finding of actual conflict.

■ This approach makes sense and we adopt the rationale. To justify a hearing to demonstrate that Rose labored under an actual conflict of interest under *Cuyler*, Enoch must at least allege facts that would show that Rose's representation of Proctor was substantially and particularly related to his representation of Enoch or that Rose learned particular information from his representation of Proctor that was relevant to Enoch's case.

■ Enoch claims in a very broad context that Rose faced divided loyalties in cross-examining Proctor and that this division of loyalty created an actual conflict. He also alleges that Rose had a conflict in that Rose had to be concerned about claims of violating attorney-client privilege that would force him to pull punches during the trial. Of course, these two claims really express only one core concern, that Rose owed loyalty to Proctor, dressed up in two different motives for Rose's alleged conflict of interest. Enoch does suggest another target for Rose's split loyalty—Rose himself. Enoch theorizes that Rose likely treated Proctor gently in order to avoid slamming the door on the possibility of representing Proctor in the future.

To establish a substantial relationship between Proctor's crime and his own, Enoch compares his case to *Church v. Sullivan,* 942 F.2d 1501 (10th Cir.1991). Enoch states that, as with Church's lawyer, Rose's prior representation of Proctor necessarily related to that of Enoch. Enoch asserts that what was important to the court in *Church* was that Church's lawyer needed to discredit his other client in order to exonerate Church, a situation similar to Enoch's need to discredit Proctor. This is true as far as it goes.

In *Church,* however, there was a relationship between the charges for which the lawyer represented each defendant. The lawyer's representation of Church and his other client was nearly simultaneous. And the other client's alleged crime carried with it the possible motive of ensuring that Church remain implicated in the crime with which he was charged.

The conflict can be pinpointed: Church's interest was that this motive be proved, but it was the other client's interest that it be disproved. The lawyer could not have pursued both interests, and even trying to do so would have risked disclosing confidences about each of the crimes and the interrelationships of the players involved.

Here, however, the entirely separate crimes for which Rose represented Proctor and then Enoch were four years apart, and none of the relevant people involved had cross-cutting relationships. Unlike in *Church,* where Church and the other client knew each other, the other robbery suspects, and something about the planning of the robbery, here there is nothing to suggest that either Proctor or Ms. Burns had ever even seen Enoch until Enoch stopped by Ms. Burns' apartment (when Proctor was there) the day before the murder. And there is no alleged factual relationship between Proctor's crime and Enoch's murder of Ms. Burns. In *Church* the two relevant crimes shared actors, and the alleged motive for the second crime was predicated on the occurrence of the first.

Enoch also directs us to the recently decided case *United States v. Malpiedi,* 62 F.3d 465 (2nd Cir.1995). There, the court decided that the lawyer for a defendant in a fraud and obstruction of justice prosecution was unable to cross-examine effectively a key government witness because the lawyer had previously represented that witness. In fact, the attorney in *Malpiedi* had an actual conflict as we define the term: He had represented the government's witness during the first of two rounds of grand jury proceedings that resulted in the defendant's indictment in the same case. This is a good example of what is meant by a substantial and particular relationship between the allegedly conflicting instances of representation. And because the witness had told lies exculpating the defendant during her first testimony before the grand jury (when he represented her), the lawyer likely learned particular confidential information during his representation of her that tended to exculpate the defendant, or that was at least pertinent to impeaching her during the defendant's trial.

Rose's previous representation of Proctor did not place Rose in a conflict of interest

with Enoch. As we have emphasized, there was no relationship between the two cases. And Enoch does not assert any actual confidences that Rose might have learned during his representation of Proctor that were relevant to Enoch's defense.

Additionally, Rose advised the trial court that he did not maintain any relationship with Proctor and that his prior representation of Proctor would not pose any difficulty in his representation of Enoch. We have noted that "the trial court's reliance on defense counsel's own assessment regarding the potential for conflict" is reasonable because the attorney is in the best position professionally and ethically to determine whether a conflict exists or if there is a risk of one arising. *United States v. Fish*, 34 F.3d 488, 493 (7th Cir.1994).

Enoch's suggestion that we assume contrary to Rose's statement has no basis in the record. Enoch has not identified any facts or circumstances relating to Rose's representation of Proctor that would have presented a conflict for Rose in his representation of Enoch. Enoch states that Rose's posture was particularly precarious because Proctor was the only other suspect in the crime. We agree with the Eleventh Circuit, however, that there is no inherent conflict where defense counsel previously represented "the most likely other suspect." *See Smith*, 815 F.2d at 1404–07.

Enoch states that "Rose must have felt pulled by divided loyalties between incriminating his former client and presenting Enoch's defense...." Appellant's Brief at 21. First, Rose owed Proctor no general duty to protect Proctor's interests (though, of course, he owed Proctor a duty not to disclose confidences). *See* Ill.R. of Prof.Cond. 1.9(a)(1) (establishing a lawyer's duty to avoid representing an interest adverse to a former client only in the same or a substantially related matter); *id.* 1.9(a)(2) (stating that a lawyer should not use information relating to the former representation of a client against that client).

Second, Rose stated to the trial court that his effectiveness would not be impaired. Enoch did not present the district court with an affidavit or deposition of Rose indicating that

Rose feels differently now about whether he had a conflict (though Enoch did submit other affidavits to support his claim for relief). At oral argument, counsel for Enoch indicated that Rose was no longer cooperating in Enoch's case; however, there was nothing submitted to the district court to indicate that Rose was unavailable to provide an affidavit, to answer interrogatories, or to be deposed. If we were to accept Enoch's argument that Rose was pulled by divided loyalties, we would either have to accept that any lawyer has a conflict of interest when he cross-examines a former client, or else create a special rule for death penalty cases (for which we discern no good reason), for there is nothing else special about this case that suggests a particular problem for Rose.

There is no basis in the record for supposing, as Enoch asks us to, that Rose might have treated Proctor with a light touch in the hope that Proctor might one day again seek his counsel. The record does show that Proctor returned to Rose's office at least once after Rose represented him but that no relationship developed from those visits. But this shows, if anything, that Rose would have had no expectation that Proctor would procure his services in the future. All Enoch has offered to show Rose's alleged conflict are speculations and conclusions unsupported by any evidence.

The district court did not grant Enoch an evidentiary hearing on his petition, and he requests such a hearing as an alternative remedy to our grant of his petition. However, an evidentiary hearing is required only where the petitioner alleges facts that, if true, would lead to a judgment in his favor. *Stoia*, 22 F.3d at 768. As mentioned, Enoch has alleged no facts supporting a substantial relationship between his and Proctor's crime, and he has not alleged any particular confidences that Rose learned during his representation of Proctor that were relevant to his case. "A hearing is not necessary if the petitioner makes conclusory or speculative allegations rather than specific factual allegations." *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir.1995). Enoch has alleged no more than conclusions and speculation. Enoch is not entitled to an evidentiary hear-

ing on his claim that Rose had an actual conflict of interest. There was no conflict of interest—constitutional or otherwise—which impaired Rose's representation of Enoch during his trial.

## B. Whether Enoch Was Subjected to Unlawful Interrogation

■ A criminal suspect has the right not to be questioned while in custody without the assistance of a lawyer. *Miranda v. Arizona,* 384 U.S. 436, 467–72, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966). After a suspect in custody states his intention to exercise that right, the police must cease interrogating the suspect until his lawyer is present or until the defendant waives his right either expressly or implicitly by reinitiating discussions with the police about the crime. *Edwards v. Arizona,* 451 U.S. 477, 484–86, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

■ Interrogation by the police includes "any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

When arrested, Enoch was read his *Miranda* rights by police detective Hoskins. The police took Enoch to an interview room at the police station where officer Cannon once more began to advise Enoch of his rights. Before Cannon could finish, however, Enoch stated that he wanted to see an attorney.

Cannon finished reading the *Miranda* rights and asked Enoch if he understood them. Enoch reiterated that he wanted a lawyer. Cannon responded by explaining the procedure for getting an attorney, that Enoch would be sent first to the Peoria County jail and booked for murder. Enoch asked whose murder, and Cannon replied the murder of Kay Burns.

Here, Cannon's description of the exact sequence of statements is susceptible of two reasonable interpretations. Under the first interpretation, Enoch responded immediately with the statement "Oh no, not Kay Burns,"

and then stated that he had been with Ms. Burns that night and that he had walked part of the way home with her after she left work. Cannon then told Enoch that he was not asking him any more questions, but that they had a witness who had seen Enoch leaving Ms. Burns' apartment that night. Enoch kept talking, and Cannon repeated that he (Cannon) was not asking Enoch any more questions.

Under the second interpretation, Cannon informed Enoch that the police had a witness who had seen him exiting Ms. Burns' apartment before Enoch reacted in any way. Enoch then exclaimed, "Oh no, not Kay Burns," and stated that he had walked her part way home from work. Cannon repeated that he was not asking Enoch any more questions, but Enoch continued to make statements.

Enoch moved to suppress his statements to the police officers. The state trial court, after conducting a hearing at which officers Cannon and Hoskins testified, found as fact the second of the two above interpretations of Cannon's testimony and denied Enoch's motion, ruling that Enoch's statements had not been responses to functional interrogation.

At trial, Officer Hoskins, who was present during the interrogation, testified that Enoch, when informed for whose murder he was being charged, responded "Oh no, not Kay Burns," and that he had walked her part way home from work. He also testified that Enoch never placed himself closer than one block from Ms. Burns' apartment.

On direct appeal, the Illinois Supreme Court noted that the exact scenario of statements was unclear, but concluded that the trial court's conclusions were supported by the evidence. On *habeas corpus* review, however, the district court, accepting the trial court's version of events (as federal courts must under 28 U.S.C. § 2254), ruled that the officers had violated Enoch's *Miranda* rights when Cannon told Enoch about the witness. The district court concluded, however, that the error was harmless because it did not have substantial or injurious influence on the jury's determination. We exercise plenary review in examining the district court's rul-

ing on whether there was custodial interrogation. *United States v. Humphrey,* 34 F.3d 551, 554 (7th Cir.1994).

■ It is our view that the police did not interrogate Enoch after he asserted his right to counsel. We have stated that, under *Innis,* "the issue is whether a reasonable objective observer would believe that the encounter was 'reasonably likely to elicit an incriminating response from the suspect' and therefore constituted the 'functional equivalent' of interrogation." *Killebrew v. Endicott,* 992 F.2d 660, 663 (7th Cir.1993).

In *Killebrew* we found the functional equivalent of interrogation where a police officer told a defendant who had not been advised of his *Miranda* rights that he would inform the district attorney of any cooperation the police received from the defendant. A reasonable objective observer would have expected the officer's invitation for the suspect to help himself by cooperating to elicit an incriminating response. *Id.*

Here, however, we merely have the police identifying the victim to the suspect and briefly stating the evidence against him, followed by the suspect's allegedly incriminating statements. Enoch suggests that this scenario falls under *Killebrew* because "[a]s any reasonable police officer would have expected ..., Enoch responded to this police interrogation ... with what he thought were exculpatory statements." Appellant's Brief at 30. Aside from the conclusory description of the officer's statements to Enoch, this assertion argues the wrong standard. The issue is whether the officer's statements were reasonably likely to evoke *inculpatory* statements, not exculpatory statements.

Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation. And here there certainly was nothing more to indicate an interrogation. In fact, officer Cannon repeated to Enoch several times that he was not questioning him any more. To a reasonable person, officer Cannon's conduct evinces a respect for Enoch's rights—both to be free from interrogation and to know why he was being held.

■ Aside from whether he was subjected to unlawful custodial interrogation, Enoch's statements to the police that were disclosed to the jury were not harmful. Our standard for harmless error analysis on *habeas corpus* review, after a state court has already concluded that the error was harmless beyond a reasonable doubt, is whether the state's use of the evidence had "substantial injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).

Here, the Illinois Supreme Court decided on direct review that any error in admitting Enoch's statements to the police was harmless beyond a reasonable doubt. *Enoch I,* 119 Ill.Dec. at 274–75, 522 N.E.2d at 1133–34. Therefore, we review for substantial injurious effect or influence. Although as enunciated this term by the Supreme Court, if we are in grave doubt as to the harmlessness of the error, we must conclude that the error was harmful. *O'Neal v. McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

The first statement, "Oh no, not Kay Burns," conveys a disheartened shock at the news and tends to exculpate Enoch. The second statement, that Enoch had been with Burns earlier in the evening and had walked her part way home to her apartment, did place Enoch near the scene of the crime. However, other witnesses placed Enoch marginally nearer to Ms. Burns' apartment than did Enoch's statement. Enoch says that the prosecution used the statements extensively to impeach his credibility, advising the jury during the opening statement that Enoch would incriminate himself, eliciting the testimony itself, and then pressing it upon the jury during closing argument to contrast his story with the stories of other witnesses.

■ Contrary to Enoch's implication, this case was about much more than discrediting Enoch's statement that he was never closer than one block to Ms. Burns' apartment. It was about proving that he murdered Kay Burns. Consider the overwhelming evidence against Enoch: his confession to Pate, Proctor's seeing him coming out of Kay Burns' apartment carrying a white shirt and wear-

ing a blue pinstriped suit, the agreement among the other witnesses that Enoch wore a blue pinstriped suit, the police finding a bloody white shirt near the scene of the crime, the recovery near the scene of the crime of a steak knife similar to one Enoch had been carrying, the blue pinstriped jacket police seized from Pate's apartment with a paper knife sheath in the pocket, and Pate's testimony that Enoch had been carrying one of her steak knives around in a paper sheath and had been wearing a blue pinstriped suit the day of Kay Burns' murder. We are not in grave doubt as to the harmlessness of Enoch's statements to police.

No reasonable jury would, in light of the above-recited evidence, focus considerable attention on the marginal discrepancy between Enoch's description of his proximity to Ms. Burns' apartment (no closer than one block) and Michael Callen's description (about one hundred feet). The other evidence was so overwhelming, and itself discredited Enoch's story to such a degree, that Enoch's statements to police could not have caused any more than slight harm; his statements had no substantial injurious effect or influence on the verdict. In fact, were we to examine Enoch's claim under the higher standard of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), as Enoch argues we should, we would conclude that any error committed in admitting the statements was harmless beyond a reasonable doubt. The other evidence left no reasonable doubt that Enoch was the killer.[2]

### C. Whether Enoch Was Denied Due Process on Direct Appeal

#### 1. Whether a new forfeiture rule was applied retroactively

■ On Enoch's direct appeal, the Illinois Supreme Court refused to review several of Enoch's claims, holding that Enoch had forfeited those claims because he had not raised them in a motion for a new trial. *Enoch I*,

119 Ill.Dec. at 272–73, 522 N.E.2d at 1130. Asserting this procedural bar, the court reviewed only the sufficiency of the evidence, plain error, and constitutional claims. Enoch argues that the court, in refusing to review Enoch's other claims, created a new forfeiture rule and applied it retroactively, thereby denying Enoch his constitutional right to due process.

We do not believe that the Illinois Supreme Court created a new rule when it ruled that Enoch had forfeited his claims. The court had stated twenty years earlier that the general rule is that only claims raised in a motion for new trial may be appealed. *People v. Pickett*, 54 Ill.2d 280, 296 N.E.2d 856, 857 (1973). It reaffirmed this position several times before 1983. *See, e.g., People v. Lykins*, 77 Ill.2d 35, 31 Ill.Dec. 805, 807, 394 N.E.2d 1182, 1184 (1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1602, 63 L.Ed.2d 787 (1980); *People v. Precup*, 73 Ill.2d 7, 21 Ill.Dec. 863, 867, 382 N.E.2d 227, 231 (1978); *People v. Gilbert*, 68 Ill.2d 252, 12 Ill.Dec. 142, 369 N.E.2d 849 (1977).

The court reaffirmed this proposition in a capital case in late 1982, stating "on this record we could hold that the alleged error was waived, but in view of the defendant's contention that he was denied a substantial constitutional right, we elect to review it." *People v. Devin*, 93 Ill.2d 326, 67 Ill.Dec. 63, 66, 444 N.E.2d 102, 105 (1982). Though the court ultimately reviewed the capital defendant's claim, *Devin* notified future defendants that failure to raise their claims in new trial motions risked forfeiture of those claims.

That case did not create a standard for an exception to the forfeiture rule; it merely showed that the Illinois Supreme Court might, in some circumstances, forgive the forfeiture. The Illinois Supreme Court is allowed to forgive without at the same time creating a right to forgiveness.

---

**2.** The fact that the jury acquitted Enoch of robbing Ms. Burns does not, as Enoch argues, cast doubt upon the jury's other verdicts. It simply suggests that a discerning jury did not believe there was evidence to show that robbery was Enoch's motive for killing Ms. Burns. The jury did convict Enoch of attempting to rape Ms. Burns, thus indicating that it may have accepted rape, or possibly Enoch's stated motive to Pate that Ms. Burns had crossed his brother Bobby, as a motive for Enoch's attack.

The absence of any capital cases strictly applying the forfeiture rule does not turn *Enoch I*'s strict application of it into a new rule. The Supreme Court has held that a state deprives a litigant of due process where it "overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case...." *Bouie v. Columbia,* 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964).

An unforeseeable application of a statutory term in a manner contrary to the explicit language of a statute can also deprive a defendant of due process. *Douglas v. Buder,* 412 U.S. 430, 432, 93 S.Ct. 2199, 2200–01, 37 L.Ed.2d 52 (1973). *Enoch I* did not overrule any authority; in fact, its holding was consistent with the precedent cited above.

The Illinois Supreme Court's application of the statutory forfeiture rule was reasonably foreseeable in light of the *Devin* case—a case decided only a few months before Enoch's trial. And it is not contrary to the Illinois Constitution or Illinois statutes, which state only that a capital defendant's conviction and sentence of death shall be subject to automatic review by the Supreme Court. ILL. CONST. ART. VI, § 4(b); ILL.SUP.CT.R. 606(a).

These laws do not say that the defendant is entitled to have the Illinois Supreme Court review any issue he wishes, regardless of his procedural defaults throughout the trial. Thus, Enoch has not met the standard of either *Bouie* or *Buder.*

### 2. The claims barred from direct appellate review

Enoch, however, raises a valid corollary claim: that if the forfeiture rule was not new, Enoch's lawyer rendered him constitutionally ineffective assistance of counsel in failing to petition the trial court for a new trial. Enoch has raised this issue at every stage of his case on appeal. The Illinois Supreme Court decided in both *Enoch I* and *Enoch II* that the evidence was so overwhelming that Enoch's unlitigated claims could not have reasonably changed the outcome. The district court decided that Enoch's attorney was not ineffective because a reasonable attorney might have interpreted the requirement of a

motion for a new trial as not applying to death cases (though the district court did not conclude that the Illinois Supreme Court created a new rule). The district court also examined Enoch's ignored claims and decided they were without merit.

Under a *de novo* standard, we undertake a fresh review of Enoch's claim that his attorney on appeal rendered constitutionally ineffective assistance of counsel in failing to file a motion for a new trial. *Hockett v. Duckworth,* 999 F.2d 1160, 1165 (7th Cir.1993).

The standard for determining whether counsel is constitutionally ineffective, apart from where a conflict of interest exists, is composed of two parts. First, we inquire whether the attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Second, we ask whether there exists a reasonable probability that the result would have been different but for counsel's errors. *Id.* at 694, 104 S.Ct. at 2068.

We note that there is a strong presumption that counsel's conduct falls within the reasonable standard of conduct. *Id.* at 688, 104 S.Ct. at 2064. In an affidavit, Rose acknowledged that he pondered whether a motion was necessary, but, after discussing the issue with the trial judge and other public defenders, he decided such a motion was not necessary.

Rose understood that the trial judge intended to proceed with sentencing the day following Enoch's conviction, leaving him little time in which to research whether a motion was required and the law relevant to the substance of a post-trial motion. Imposition of sentence, Rose concluded, would divest the trial court of jurisdiction and render moot any motions for new trial.

It is apparent now that, to preserve all of Enoch's claims of error for review on direct appeal, Rose should have moved to continue sentencing until he could prepare a motion for a new trial. Had the trial court denied that motion, no claim would have been forfeited.

With regard to the necessity of filing a motion for a new trial in a capital case, *Devin*, decided less than a year before Enoch's trial, should have put Rose on notice of that requirement. Notwithstanding the uncertainty of the local bench and bar of Peoria, we assume for the purpose of our analysis that it was unreasonable for Rose to be uninformed that *Devin* implied that a new trial motion was necessary in a capital case. He could not reasonably rely on the hope that the Illinois Supreme Court would be lenient with Enoch's appeal.

Thus, we move to the issue of whether the outcome of the appeal would have been different if the Illinois Supreme court had considered Enoch's forfeited claims. That is, was Enoch prejudiced by his counsel's deficient representation. To demonstrate prejudice, a defendant typically must show that counsel's failures rendered the proceeding "fundamentally unfair or made the result unreliable." *Hollenback v. United States*, 987 F.2d 1272, 1275 (7th Cir.1993). But where there has been an actual or constructive denial of assistance of counsel altogether, the defendant does not need to establish prejudice. *Castellanos v. United States*, 26 F.3d 717, 718 (7th Cir.1994). We recently applied this standard where a defendant told his attorney to file an appeal, but the attorney failed to file a timely notice of appeal (though he did eventually file one). *United States v. Nagib*, 56 F.3d 798, 801 (7th Cir. 1995).

Enoch's case is the typical type (requiring a separate showing of prejudice), where the attorney failed to bring obvious claims to the attention of the appellate court but argued others. It parallels *Nagib* in that the lawyer tried to present the defendant's claims but failed due to procedural default. But the underlying reasoning for *Castellanos* and *Nagib* was that "no one has looked at the record with an advocate's eye." *Castellanos*, 26 F.3d at 718.

Here, Rose combed the record with an advocate's eye and fully briefed the alleged errors. The problem, caused by Rose's default, was that, while the Illinois Supreme Court did look at some of the issues briefed on appeal (those claiming constitutional error, plain error, and sufficiency of the evidence), the court refused to look at others.

On balance, this is a case where a petitioner claims that his lawyer presented some claims but not others. Consequently, we must examine Enoch's direct appeal to determine whether his lawyer's sole instance of ineffective assistance rendered the proceeding fundamentally unfair or made the result unreliable.

Enoch's claims on direct appeal, as we have pieced them together, were as follows:

*a. Those that were addressed by the Illinois Supreme Court*

1. That Enoch's custodial statements to police should not have been admitted into evidence against him;

2. That the prosecution provided insufficient evidence to prove that Enoch committed murder in the course of aggravated kidnapping and that his kidnapping conviction was improper because the same act that constituted the kidnapping was also one of the two acts that constituted the attempted rape;

3. That the prosecution provided insufficient evidence to prove that Enoch committed murder in the course of attempted rape;

4. That the trial court erroneously refused to instruct the jury on the lesser included offense of unlawful restraint and erroneously omitted a paragraph of the pattern jury instruction on the meaning of circumstantial evidence; and

5. That the Illinois death penalty statute was unconstitutional.

*b. Those that the Illinois Supreme Court found forfeited*

1. That the trial court erred in admitting evidence of a prior rape and a prior attempted rape committed by Enoch;

2. That it was error for the trial court to allow police officer Cannon, who had directed the investigation and arrest of Enoch, to assist the state in selecting jurors and to sit at counsel's table;

3. That the prosecution violated Enoch's rights by engaging in improper argument during opening statements;

4. That the trial court deprived Enoch of a trial before a fair and impartial jury when it failed to dismiss two jurors;

5. That Enoch did not knowingly and intelligently waive his right to jury sentencing because the judge did not adequately inform him that he might not receive the death penalty if the jury did not unanimously decide it was appropriate; and

6. That the trial court erroneously concluded during sentencing that Enoch presented a clear and present danger in prison.

We will examine those claims that the Illinois Supreme Court declined to review in order to determine if Rose's procedural failure rendered the review on direct appeal in *Enoch I* fundamentally unfair or rendered the result unreliable.

■ First, Enoch claimed that the trial court erred in admitting evidence of a prior rape and a prior attempted rape committed by Enoch. This claim drew support from the dissent in *Enoch I*. The evidence consisted of testimony from witnesses Louella Burnside and Marilyn McClain that Enoch had previously attacked them in ways similar to the way the evidence shows he had attacked Ms. Burns.

Burnside testified that, while she was walking down the street looking for her husband, Enoch approached her, told her his name was Willie, and began conversing with her. When she started back toward her house, Enoch stabbed her in the back, dragged her into a garage, and raped her. He then ripped up her jacket, tied her hands with the shreds, and stuffed a piece of material in her mouth.

Marilyn McClain testified that Enoch came to her door and asked if she knew where his brother Bobby lived. He asked for a drink of water. McClain brought it and, as she returned the glass to the kitchen, Enoch stepped in and locked the door. He approached her with a pocket knife and warned

her not to say anything or he would kill her. He then led her to the couch and cut her stomach. Enoch shredded a towel, tied her hands behind her back, and asked her if she had her period. As Enoch searched for money, McClain escaped, and Enoch then fled.

The trial court found that the evidence provided by Burnside and McClain was admissible to show Enoch's identity and his intent to commit rape, kidnapping, and armed robbery. The court instructed the jury that Burnside's and McClain's testimony was probative only for those purposes.

The *Enoch I* dissent noted that "The general rule is that evidence of offenses not charged in the indictment on which a defendant is being tried is inadmissible." *Enoch I*, 119 Ill.Dec. at 282, 522 N.E.2d at 1141 (Simon, J., concurring in part and dissenting in part). The dissent conceded that an exception exists to show motive, intent, identity, or common design of the perpetrator, or to show the perpetrator's identity by revealing his *modus operandi*. *Id.* 119 Ill.Dec. at 283, 522 N.E.2d at 1142. The dissent concluded, however, that the trial court improperly admitted the evidence. *Id.*

It is true that there was no evidence that Enoch's attack on Ms. Burns was part of common scheme with the attacks on Burnside and McClain, and the prior offenses appeared to be sufficiently different from the attack on Ms. Burns that the *modus operandi* theory was unsupported as well.[3] *Id.* However, Burnside's testimony that Enoch had raped her was probative of whether Enoch intended to rape Ms. Burns. Enoch at first approached Burnside in a way designed to gain her confidence, had used a knife to intimidate her, had bound her hands behind her back with materials Enoch found at the scene, had partially disrobed her, and had, in fact, raped her.

Similarities between Enoch's attack on McClain and his attack on Ms. Burns also attest to Enoch's intent to rape. For exam-

---

3. In order to be admissible to show *modus operandi*, there must be a "strong and persuasive showing of similarity" between the prior offenses and the crime charged. *People v. Tate*, 87 Ill.2d 134, 57 Ill.Dec. 572, 576, 429 N.E.2d 470, 474 (1981). "[T]here must be some distinctive features that are not common to most offenses of that type in order to demonstrate *modus operandi*." *Id.* at 577, 429 N.E.2d at 475. The trial court, in fact, rejected this theory of admissibility.

ple, just as with Ms. Burns, Enoch attempted to gain McClain's confidence before attacking her by mentioning that he was looking for his brother Bobby. (Recall that Enoch had attempted to use this ploy before he actually attacked Ms. Burns, but was apparently thwarted when he saw that Proctor was with Ms. Burns. And, at the hospital, Enoch had asked about Bobby before striking up a conversation with Ms. Burns.) And, although the knives Enoch used in each of the crimes may have been different, the fact remains that using a knife was Enoch's preferred method of subduing his victims. While Enoch did not actually rape McClain, his inquiry regarding her period could reasonably be seen to evince his intent to have forced sexual intercourse with her had she not escaped. Finally, these attacks occurred within two months of each other (Burnside: March 6, 1983; McClain: March 30, 1983; Burns: April 23, 1983).

The probative value of such evidence must be weighed against the danger of any unfair prejudicial impact the evidence posed, and in Illinois this balancing is left to the sound discretion of the trial court. *People v. Gonzales*, 60 Ill.App.3d 980, 17 Ill.Dec. 901, 911, 377 N.E.2d 91, 101 (1978). Here, the trial court did not explicitly balance the two concerns on the record, but its decision to admit the evidence implies that it found that the probative value of each woman's testimony outweighed the danger of any unfair prejudicial impact the testimony might have.

Illinois courts have upheld numerous decisions in sex crimes trials where evidence of other sex crimes committed by the defendant was admitted into evidence. *Id.* Additionally, the trial court's limiting instruction curbed any unfair reach of the evidence. *See id.* (noting the salutary effect of an instruction limiting the jury's use of other crimes evidence). Viewing the trial court's implicit balancing deferentially, the similarities among the attacks were sufficient to support the trial court's decision to allow their admission into evidence.

■ Second, Enoch asserted that it was error for the court to allow officer Cannon, who had investigated and arrested Enoch, to assist the state in selecting the jury and to sit at the prosecution's table. Illinois courts have held that it is not error for courts to exempt from exclusion orders a police officer who remains in the courtroom to assist the prosecution. *People v. Adams*, 41 Ill.2d 98, 242 N.E.2d 167, 169 (1968); *People v. Scott*, 38 Ill.2d 302, 231 N.E.2d 441, 444 (1967). However, Enoch argues that Cannon's presence lent credibility to all police officers who testified for the state and subconsciously lulled jurors into believing the state's case because they knew they had the approval of officer Cannon. Not surprisingly, Enoch cited no cases to support this highly inventive and patently meritless claim.

Third, Enoch claimed he was deprived of a fair trial when the prosecutor improperly commented on evidence during his opening statement to the jury. In particular, Enoch alleged that the prosecutor commented upon Enoch's decision whether to testify and thereby violated his Fifth Amendment right against self-incrimination. The test for determining whether the prosecutor has improperly commented on the defendant's decision whether to testify is "whether the reference was intended or calculated to direct the attention of the jury to the defendant's failure to testify." *People v. Perry*, 183 Ill. App.3d 534, 132 Ill.Dec. 639, 644, 540 N.E.2d 379, 384 (finding no improper comment where the prosecution stated that there was "no way of opening defendant's mind" to find out what really happened), *appeal denied*, 127 Ill.2d 633, 136 Ill.Dec. 600, 545 N.E.2d 124 (1989).

■ The prosecutor mentioned the murder weapon in his preview of the evidence, stating "the knife, we submit to you, that is in evidence was probably the knife used, but only one person knows that for sure." This could be taken as an implication that only Enoch knew whether the knife was the murder weapon. But that implication is greatly attenuated and does not reasonably amount to a comment upon the need for Enoch to testify—and in fact it drew no objection from Enoch's counsel. Rather, taken in context (it came after description of the circumstances surrounding the finding of the sheath in Enoch's pocket with a view toward Pate's anticipated testimony that Enoch had been carrying a knife), it amounts only to a comment on the strength, and limitations, of the physical evidence. The comment does not suggest

the prosecution's intent or calculation to draw the jury's attention to the defendant's decision not to testify.

■ The prosecutor also referred in his opening statement to the details of Louise Pate's testimony before the grand jury, testimony that the prosecution later sought to admit but that the court excluded. Enoch asserts that the state therefore brought to the attention of the jury facts not admitted into evidence. A prosecutor may not "comment during his opening statement upon evidence that will be introduced and fail to introduce that evidence." *People v. Tenny*, 224 Ill.App.3d 53, 166 Ill.Dec. 445, 451, 586 N.E.2d 403, 409 (1991), *appeal denied*, 144 Ill.2d 641, 169 Ill.Dec. 149, 591 N.E.2d 29 (1992). Here, the prosecution introduced the testimony to which it referred during opening statements, but the judge refused to admit it. Moreover, Pate subsequently testified to each of the details mentioned by the prosecution. There was no error.

■ Fourth, Enoch argued that he was deprived of a fair and impartial jury when the trial court refused to remove two jurors that, Enoch contended, harbored potential bias. One of the jurors, however, was actually an alternate who never participated in deliberations, so any error with regard to removal of that juror was clearly harmless.

■ The other juror told the court after the jury had been sworn that she recalled how she may at one time have met one of the prosecution's witnesses while working for Caterpillar a few years before. She also stated to the court, however, that she was not sure she had met him and that, even if she had, that recognition would not prevent her from being fair and impartial.

The court refused Enoch's request to dismiss her for cause. The juror's connection to the witness was both uncertain and remote in time and relationship. The juror told the judge under oath that she could remain impartial, and nothing about her putative connection to the witness undermines her statement. There was no error in refusing to remove that juror. *See People v. Hobley*, 159 Ill.2d 272, 202 Ill.Dec. 256, 267, 637 N.E.2d 992, 1003, *cert. denied*, — U.S. —, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994) (finding no error where trial court denied motions to dismiss two jurors who, though indicating some bias in favor of police officers' testimony, did not express any reservation concerning their abilities to follow the law).

■ Fifth, Enoch asserted that he did not knowingly and intelligently waive his right to have his sentence decided by the jury. The trial judge, Enoch argued, committed error in that it did not tell him that the jury did not have to be unanimous for him to avoid the death penalty. Instead, the judge merely told him that, in order for the death penalty to be imposed, the jury had to return unanimous verdicts in favor of the death penalty at each stage of the proceedings. Enoch told the court that he understood this.

Enoch's claim on appeal was that he may have understood the trial court to mean that the jury had to decide unanimously that he should not be given the death penalty in order for him to avoid it. There was no merit to this claim. The trial court's instruction to Enoch was not ambiguous. If the death penalty, as the court stated, could be given only if the jury is unanimous that it should be given, it is not reasonable to conclude that unanimity is required to avoid the death penalty.

There were only two possible decisions for the jury: impose the death penalty or decline to impose it. If unanimity is required for one and is not achieved, the other results. To assume that Enoch unreasonably misunderstood the court's instruction would force courts to mistrust all knowing and intelligent waivers by defendants. Enoch's waiver was sufficient.

■ Sixth, Enoch submitted that the trial court erroneously concluded during sentencing that Enoch presented a clear and present danger in prison. The court, Enoch contended, had no evidence before it that Enoch had ever posed a danger to other inmates while incarcerated, that he had ever acted violently while in police custody, or that he had ever violently attacked men. Enoch argued as though a finding that Enoch would present a clear and present danger to other prison inmates was a necessary prerequisite to his receiving the death penalty. However, it was not. *See* 720 ILCS 5/9–1(h) (formerly ILL.REV.STAT. ch. 38, ¶ 9–1(h)) ("If the court

determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.") *See also* 720 ILCS 5/9–1(c) (enumerating, but not exhausting, mitigating factors, of which defendant's likely relationship to others in the prison community is not one).

The trial court came to its conclusion when rejecting Enoch's argument in mitigation that he would not be a danger to society in prison. Whether the judge had enough evidence to conclude that Enoch would commit specific crimes against other inmates was not the issue; the issue, raised by Enoch, was whether Enoch's inability to attack other women while in prison mitigated against the death penalty.

The court believed, given the evidence of the crime, that Enoch's wanton disregard for life made him a clear and present danger in prison; therefore, Enoch's inability to attack women was not a mitigating factor. The Illinois death penalty statute does not provide that mitigating factors must be proved or disproved by any quantum of evidence. The judge must consider claims of mitigation, but does not have to accept them.

It is significant to emphasize that the Illinois Supreme Court stated more than once in *Enoch I* that it found the state's evidence of Enoch's guilt convincing. *See Enoch I*, 119 Ill.Dec. at 274, 522 N.E.2d at 1133 (beyond a reasonable doubt that Enoch killed Ms. Burns), 119 Ill.Dec. at 265, 522 N.E.2d at 1124 (evidence establishes that victim was secretly confined and that she was restrained by Enoch), 119 Ill.Dec. at 276, 522 N.E.2d at 1135 (there was sufficient evidence, other than the prior crimes evidence, to support the conviction for attempt rape), 119 Ill.Dec. at 278, 522 N.E.2d at 1137 (evidence of guilt so overwhelming that outcome of trial would not reasonably have been different but for counsel's alleged errors).

In light of the Illinois Supreme Court's view of the case as a whole, we do not believe that its decision affirming Enoch's conviction was rendered fundamentally unfair nor that the result was unreliable because of its refusal to examine the claims that Enoch, through a mistake of his counsel, forfeited. Therefore, Enoch was not prejudiced, and we conclude that Mark Rose did not render constitutionally ineffective assistance of counsel in his failure to file a motion for a new trial.

## IV. Conclusion

We AFFIRM the district court's denial of Willie Enoch's petition for writ of *habeas corpus*.